[No. 39256.     En Banc.     February 20, 1969.]

THE STATE OF WASHINGTON, *on the Relation of Robert E. Schillberg, Appellant,* v. SAFEWAY STORES, INC., *Respondent.**

*Reported in 450 P.2d 949.

340

*Robert E. Schillberg* and *Donald E. Priest*, for appellant.

*Bogle, Gates, Dobrin, Wakefield & Long, Dustin C. Mc-Creary*, and *Yancy Reser*, for respondent.

*The Attorney General, Donald L. Navoni* and *James M. Kennedy, Assistants*, amici curiae.

HALE, J.—They used to play "Bonus Bingo" in the Safeway Stores in Snohomish County. Then, the prosecuting attorney put a stop to it. He says that Bonus Bingo is a lottery, that this makes it a nuisance, and that the scheme should be enjoined. Safeway says that Bonus Bingo is neither a lottery nor a nuisance but is simply an advertising device of a type widely employed in merchandising. We incline toward the prosecuting attorney's point of view.

The case was initiated on an agreed statement of facts by an action for a declaratory judgment on the legality of Bonus Bingo, and for an injunction brought by the Prosecuting Attorney for Snohomish County against Safeway Stores, Inc., a Maryland corporation.

Safeway operated 10 retail food stores in Snohomish County. In February, 1966, it commenced an advertising promotion contest called "Bonus Bingo" in each store. The parties stipulate that the scheme was intended to advertise Safeway's retail food stores and merchandise as a part of that company's normal advertising activities with no intent to operate a lottery or conduct a gambling enterprise.

But intentions are not necessarily the legal sine qua non. Conduct, no matter how well meant, may, in law, override the best of intentions and give a bad legal effect to good purposes. Safeway inaugurated the Bonus Bingo advertising campaign by conspicuously posting in each of the 10 stores signs saying:

> One FREE card per store visit. No purchase required. Purchasers not favored. No need to pass through checkstand. Secure your free card at either end of checkstand or from any store employee.

The company ran boxed announcements containing similar messages in its food ads in the daily and weekly papers throughout Snohomish County. For example, Safeway's display advertisement in The Enterprise of March 9, 1966, alongside that portion of the ad showing large, fresh, red-ripe tomatoes at 19 cents per pound, carried a box insert saying "BONUS BINGO—Every day brings NEW WINNERS and YOU can be one of them. Here are just a few of last week's winners." The box ad contained photographs of two $1,000 winners and listed by name and city two $500 winners, ten $100 winners, three $50 winners and nine $20 winners.

In another typical advertisement in the Safeway ad for the Arlington Times for March 17, 1966, there was a similar box picturing two $1,000 winners and one $100 winner, and in large, bold type said, "OVER 2,000 WINNERS." Referring to two insignia called "Bonus Bingo Prize Slips," the ad in smaller type said, "Clip these slips" and, in still smaller type, "or Hand-Print in Plain Block Letters on A Plain Piece of Paper." Each prize slip had a program number printed on it above Safeway's name and symbol.

These are but brief examples of Safeway's advertising campaign concerning Bonus Bingo. All of the advertising connected with Bonus Bingo contained in one form or another a caveat: "One FREE card per Store visit. No purchase required. Purchasers not favored. No need to pass through checkstand. Secure your free card at either end of checkstand or from any store employee." Like announcements were placed in the large weekly advertisements run by Safeway in the daily and weekly papers throughout Snohomish County. These ads, proclaiming sales on nearly a hundred food and grocery items, uniformly contained prominently placed box messages announcing the current Bonus Bingo game, the previous winners and the amounts won. Each ad also carried two Bonus Bingo prize slips to be clipped (or hand printed) for use in the next game.

To participate in Bonus Bingo and get a chance to win a prize, all one had to do was acquire—without cost—Bonus Bingo prize slips and a Bonus Bingo booklet put out by

Safeway. The booklet, it is agreed, could be picked up free of charge at any Safeway store "by the general adult public without the necessity of making a purchase or a request, or going through a checkstand. . . . [And] persons wishing to participate . . . were not required to own or possess a copy of said booklet, but were free to use booklets possessed by friends or neighbors, and some in fact did so."

The booklet had 15 pages and provided material for 8 games. It stated that there would be "Over $82,000 in Cash Awards" and that there were "Many ways to win over 30,000 cash prizes." All of the eight games were to be played on separate pages, each of which were marked with a square diagram containing 25 equal squares. Some of the squares were imprinted with green X's. To win, one had to complete a row of X's in a straight line, either vertically, horizontally or diagonally by filling in the empty squares with Bonus Bingo prize slips. Directions for participation stated:

> Each time you visit our store you will receive ABSO-LUTELY FREE—a BONUS BINGO Prize Slip bearing a "wash-off" patch on the front which conceals the identity of one of the 8 Games to which THAT prize slip applies and the NUMBER and LETTER of the specific Box you can score on that BONUS BINGO game.
>
> Remove patch while holding slip under running water by rubbing patch VERY GENTLY with finger to reveal GAME and Box specified.
>
> Locate THAT designated Game in this book and mark Box specified on slip with an X to indicate receipt of prize slip. Prize slips may ONLY be applied to the GAME and Box specified. ALL BOXES printed with a GREEN X are FREE BOXES and count as scored To HELP YOU WIN.
>
> YOU WIN the prize shown for any GAME just by scoring any 5 BOXES in a straight line (EITHER HORIZONTAL, VERTICAL OR DIAGONAL) using any combination of FREE BOXES, store slips and newspaper slips.
>
> To CLAIM YOUR PRIZE—just sign and submit to our Store Manager ONLY those prize slips which helped you score any 5 Boxes in a straight line on any one Game. When slips submitted score bingo on more than one line,

only one prize will be awarded. All winning prize slips subject to verification.

Booklets, as earlier observed, could be obtained simply by requesting them from any Safeway employee or at a courtesy counter in the store or at either end of the check-stands, or from most anyone who had one to spare. Prize slips, however, had to be obtained at a Safeway store. One had actually to visit Safeway to get a prize slip but it was available there without charge or need to make a purchase. Extra bonus prize slips which enhanced one's chance of winning a prize, however, could be clipped from Safeway's weekly newspaper advertisements, or by drawing a facsimile thereof or obtaining duplicated copies free of charge at any Safeway store. On each page of the bonus booklet were extensive messages advertising Safeway's products along with drawings and pictures illustrating the advertising messages.

It all added up to a scheme designed largely as an advertising or sales promotional device in which the general adult public was invited to participate free of charge without being required to make any purchases or pay any money and in which every participant, depending upon his luck, had a chance to win a cash prize. Bonus Bingo did not, according to the agreed facts, affect the quality or prices of Safeway's merchandise or otherwise alter its merchandising policies.

The game did produce business benefits to its sponsor. According to the agreed statement of facts:

12. Of the total number of prize slips distributed in Snohomish County stores, approximately 25% were distributed to persons who did not make purchases and approximately 75% were distributed to persons who made purchases.

13. During the period that said Advertising Promotion was conducted by Safeway in its Snohomish County stores, there was a material increase in store traffic and business volume at said stores. Said increase was greater than would normally be expected to result solely from factors other than said Advertising Promotion.

14. It was possible to win an Advertising Promotion prize on one free prize slip obtained from a single store visit, however it was necessary to make at least one store visit in order to win a prize.

Concluding that Bonus Bingo in all its ramifications was neither a lottery within the meaning of RCW 9.59.010 nor a public nuisance under RCW 9.66.010 nor RCW 7.48, and that the scheme was in fact a lawful means of promotional advertising, the learned trial judge denied the injunction and Snohomish County appeals.

█ At the outset, we are confronted with Const. art. 2, § 24, which declares: "The legislature shall never authorize any lottery . . . ." In interpreting that provision, this court has traditionally declined to accept the historical argument that the constitution meant only to prohibit the state itself from conducting, promoting or fostering, directly or indirectly, any lottery. Instead, the court has regarded the constitutional prohibition against lotteries as broad and sweeping in character and application—broad enough even to engender a holding that slot machines constitute a form of lottery not to be countenanced directly or indirectly by the legislature even in private clubs. *State ex rel. Evans v. Brotherhood of Friends*, 41 Wn.2d 133, 247 P.2d 787 (1952). Then, too, the constitutional provision against lotteries is mandatory and self-executing. *Seattle v. Chin Let*, 19 Wash. 38, 52 Pac. 324 (1898). Being self-executing, the legislature cannot, by loose, vague or inapt definition of lottery, constitutionally authorize indirectly in law what the courts reasonably find to be a lottery in fact. *State ex rel. Evans v. Brotherhood of Friends, supra.*

We think, however, the legislature adopted what appears to be an apt definition:

A lottery is a scheme for the distribution of money or property by chance, among persons who have paid or agreed to pay a valuable consideration for the chance, whether it shall be called a lottery, raffle, gift enterprise, or by any other name, and is hereby declared unlawful and a public nuisance. RCW 9.59.010.

Safeway, contending that Bonus Bingo is not a lottery

in law or fact under the statute, rests its position on two major premises: (1) RCW 9.59.010 is a criminal statute and must be strictly construed; and (2) members of the public who participate in the game at Safeway's invitation do not pay, agree to pay, or deliver any valuable consideration for the chance to win a prize. Safeway contends that the rule of strict construction applicable to criminal statutes precludes the courts from enlarging the idea of consideration beyond the actual paying or delivering of money or other things of value, and that the lottery statute is designed to prohibit one from hazarding or losing and another from taking or winning something of value purely upon a chance event. Thus, it is contended, unless the player actually parts with something of value, by wagering it upon the turn of an uncertain or fortuitous event, it is no lottery. According to this argument, since the members of the public neither pay money nor hazard any tangible or intangible property for the chance to win a prize, Bonus Bingo would probably not be a lottery.

■■ The basic question before us, however, is whether a member of the public who participates in Bonus Bingo as a player seeking to win prize money, even though he pays no fee, buys no tickets, and wagers no property, tangible or intangible, advances what in law would constitute a consideration upon that chance to win a prize. To answer it, we should first ascertain what it is that amounts to a lottery. Its elements, of course, are consideration, prize and chance. *Society Theatre v. Seattle,* 118 Wash. 258, 203 Pac. 21 (1922); *D'Orio v. Jacobs,* 151 Wash. 297, 275 Pac. 563 (1929). Although enjoined to give the lottery statute a strict construction, if the two elements prize and chance are undeniably present, we think that the third element, valuable consideration, encompasses not only other tangible or intangible forms of property but includes also the broader concepts of consideration universally deemed sufficient to support a contract.

Article 2, section 24 of the state constitution, prohibiting the legislature from ever authorizing *any* lottery, we have said, is phrased in the broadest and most sweeping terms.

It prohibits *any* lottery. · We believe the word "any," given its usual meaning, is all embracing as far as different types and kinds of lottery schemes and devices are concerned. Clearly, its meaning seems to us to be the equivalent of the terms *all* or *every. State ex rel. Evans v. Brotherhood of Friends, supra,* at 145.

Accordingly, to give effect to this broad interdiction, the courts must look into, through and around any schemes and devices which appear even superficially to constitute a lottery, and to apply the constitutional ban to all of them which in fact amount to a lottery.

*Society Theatre v. Seattle, supra,* examined such a seemingly innocent scheme and concluded that a theater which allowed members of an advertising association to advertise their products by distributing free, numbered tickets to theater patrons from which drawings for groceries were made by chance or lot entitling the holder of the winning number to free groceries, was conducting a lottery, even though the theater had no direct connection with distributing either the tickets or the prizes, and the persons receiving the tickets paid nothing for them. In that case, we said:

But it is argued that the element of consideration does not appear because the patrons of the theatres pay no additional consideration for entrance thereto, and pay nothing whatever for the tickets which may entitle them to prizes. But while the patrons may not pay, and the respondents may not receive, any direct consideration, there is an indirect consideration paid and received. The fact that prizes of more or less value are to be distributed will attract persons to the theatres who would not otherwise attend. In this manner those obtaining prizes pay considerations for them, and the theatres reap a direct financial benefit.

Although the theater patron in *Society Theatre v. Seattle, supra,* paid nothing for the ticket which went into the drawing, he did pay for his theater admission ticket, whereas in Bonus Bingo the participant need not part with any money or property to have a chance to win. Any real distinction, however, between the two cases on the question of consideration seems to us superficial and of slight legal

consequence. The rationale of *Society Theatre v. Seattle,* *supra,* implies that, where the two elements of a lottery clearly exist, *i.e.,* prize and chance, the courts will examine the details of the game minutely to see if a consideration, in whatever form, actually moves from the participants to the promoters, and to ascertain whether there is an actual loss on the one hand or a genuine gain on the other, or perhaps both a loss and a gain. But, if prize and chance are manifest, any substantial consideration, supplied in whatever form, will make it a lottery.

Any doubt as to the extremely broad view of consideration taken by this court in lottery cases will be put to rest, we think, by a reading of *State v. Danz,* 140 Wash. 546, 250 Pac. 37, 48 A.L.R. 1109 (1926). In *Danz,* we had before us the then familiar scheme of a "country store" night at the movies. Patrons of the theater on Thursday nights were issued, along with their admission ticket, a numbered ticket without additional charge. Duplicately numbered tickets went into a receptacle for a drawing. Holders of the winning tickets would receive as prizes certain grocery items of substantial value. As though to remove the idea of consideration entirely from the scheme, free tickets for the grocery drawing were available without necessity of buying an admission ticket to anyone who wished a chance to win a prize. One could, without purchasing a theater admission, obtain a free numbered ticket for the drawing and stay outside the theater. If no one in the theater audience held a winning ticket, announcement of the winning number would be made outside of the theater, and anyone holding the winning number there had the right to enter the  theater free of charge and claim the prize. Thus, persons who gave nothing but their time and attention were eligible to win, and the scheme was conspicuously so advertised.

Holding that a genuine consideration existed and that country store night at the movies amounted to a lottery, we said, "Nor is the fact that free tickets were offered to outsiders material in any controlling sense." We reaffirmed the rationale of *Society Theatre v. Seattle, supra,* and quoted

from it the statement "that the theatres have no direct connection with the distribution of the tickets or the prizes, and that the persons receiving them do not pay any direct consideration for them." This, we said, alone did not remove the scheme from the lottery provision of the constitution and statutes because "The fact that prizes of more or less value are to be distributed will attract persons to the theatres who would not otherwise attend. In this manner those obtaining prizes pay considerations for them, and the theatres reap a direct financial benefit.

Differences between *Danz* and its country store game and the present case with its Bonus Bingo seem slight indeed in light of our broad view concerning the meaning of the constitution when it forbids the legislature from ever authorizing any lottery. The *Danz* holding, therefore, we believe to be controlling over Bonus Bingo. As in *Danz*, the fact that prizes are to be won in Bonus Bingo will attract persons to Safeway and to its advertising.

■ Our views in *Society Theatre,* and a posteriori *Danz,* too, find strong support in what is perhaps a leading case on the question of consideration as an element of a lottery. *Lucky Calendar Co. v. Cohen,* 19 N.J. 399, 117 A.2d 487 (1955). In that case, it was shown that, to win a prize offered by the Acme Stores, the participant "need purchase nothing . . . need pay nothing" nor do anything except complete a coupon form and deposit the coupon in a box just inside the door of his nearest Acme Market. The opinion, *per* Vanderbilt, C. J., not only cites with approval *Society Theatre,* but goes even farther in finding a consideration where nothing of value was actually paid or delivered for a chance to win certain household appliances on a drawing of coupons attached to calendars issued without charge to customers of a supermarket chain. All the customer had to do was deposit an extracted coupon in the prize contest box just inside the store door. Finding a consideration essential to a lottery, the court there said, at 414:

But we do not have to rest our decision on this construction of our statute alone as negativing the need for

> consideration to find a lottery, for consideration is in fact clearly present here, both in the form of a detriment or inconvenience to the promisee at the request of the promisor and of a benefit to the promisor. It is hornbook law that if the consideration is sufficient to sustain a simple contract (if otherwise legal), it is sufficient to satisfy this third alleged element of lottery.

and adds:

> The law will not inquire as to the adequacy of consideration when the thing to be done is asked to be done, be it ever so small.

Since the legislature of this state may not, under the constitution, directly authorize any kind of lottery at all, it cannot, by means of a loose, uncertain or inapt definition, authorize indirectly that which the constitution forbids it to do directly. Given a scheme involving a prize to be won purely by chance or lot, the courts will look most closely to see if any substantial consideration moves from player to promoter, a procedure we think not only enjoined upon us by the constitution but also called for by the language of the lottery statute (RCW 9.59.010) which uses the broad term *consideration* and not the narrower term *property or thing of value*. Encompassed then within the term *consideration,* as the third element of lottery, would be those acts of forbearances, promises, or conduct which in law are sufficient to support an agreement.

Under our constitution and lottery statute, therefore, one need not part with something of value, tangible or intangible, to supply the essential consideration for a lottery. He may, in order to secure a chance to win a prize awarded purely by lot or chance, supply the consideration by his conduct or forbearance which vouchsafes a gain or benefit to the promoter of the scheme. The benefit or gain moving to the one need not be the same as the detriment to the other. Consideration for a lottery may be both gain and detriment or one without the other.

All of the obvious paraphernalia inherent in a lottery, except consideration, existed in Bonus Bingo from the outset. The lure of a prize awarded upon chance or

lot to a few winners among numerous players manifested the first two elements, prize and chance. Less obvious, but, nevertheless, present, was the other element, consideration. Benefits in the form of increased sales, good will and public response to the advertising of Bonus Bingo amounted to a consideration valuable indeed to the promoters and supplied the third element, consideration. The scheme produced for Safeway everything that could reasonably have been expected from it. Even though the general public could participate without making any purchases or paying any money as a condition of participation, the parties agreed that "Of the total number of prize slips distributed in Snohomish County stores, approximately 25% were distributed to persons who did not make purchases and approximately 75% were distributed to persons who made purchases."

The agreed facts show that Safeway experienced a material increase in business not attributable to any factor other than the effects of Bonus Bingo. A participating member of the public who, in order to make himself eligible to win a prize wholly on chance or lot by playing Bonus Bingo, had first to procure and then peruse extensive Safeway advertising material, all proclaiming the worth and universality of the name "Safeway," and its merchandise. He had to expend time, energy and perhaps money, too, by visiting Safeway to procure a prize slip, the basic token employed in the game, for, even though the prize slips were issued on mere request without need to purchase any merchandise, the player must visit a store to procure one. The visit to a Safeway store and a perusal of the promoter's advertising under the *Danz* rationale amount to a consideration moving from player to promoter.

During the Bonus Bingo promotion, it was agreed Safeway stores experienced a material increase in store traffic and business volume attributable to the game. At least one visit to a Safeway store was necessary in order to win a prize.

If Safeway charged a solitary penny for a Bonus Bingo booklet or for a prize slip, it could not be sensibly argued

that Bonus Bingo would not then be a lottery. Where it received not a penny, but something worth far more to players and promoters—the time, attention, and the efforts of countless persons in studying Safeway advertising and in making at least one trip to a Safeway store—it is apparent that the consideration moving from the players to promoters was actually greater than had there been a mere sale and distribution of booklets or prize slips for money.

There is truth in the oft-repeated statement that laws against lotteries are designed to prevent impoverishment of the unwary, to discourage the gambling spirit and prevent the public from wagering their substance upon chance and fortuitous events so that one cannot be enticed to hazard his earnings on a chance to win a prize. But there are other cogent reasons for laws against gambling in general and lotteries in particular. The antigambling laws are designed not only to prevent loss but to preclude some kinds of gain to the promoter of a lottery from reaping an unearned harvest at the expense of the players; to prevent the wary from preying upon the unwary; and to discourage the overly shrewd from exploiting the natural yearning in most everyone to get something for nothing; and to put a damper on the actions of those who receive from the device much more than they part with in prizes. If, under our mores, it is bad for a man to lose his property on pure chance or lot, it is equally bad for a man to gain property on the same pure chance or lot.

Here there was a great gain and an appreciable loss. Safeway gained as a consequence of its attracting thousands of persons to its stores who would not otherwise go there; it won the time, thought, attention and energy of members of the public in studying Safeway's advertising and journeying at least once to its stores; and it won an actual increase in patronage from them, too. The players, on the other hand, wagered their time, attention, thought, energy, and money spent in transportation studying Safeway's advertising and in journeying at least once per game to a

Safeway store for a chance to win a prize—all of which, we think, amounted to a valuable consideration moving from the players to the promoter.

Accordingly, we believe Bonus Bingo was a lottery, and we reverse with instructions that the injunction issue.

HUNTER, C. J., HILL, FINLEY, WEAVER, and ROSELLINI, JJ., concur.

HAMILTON, NEILL, and McGOVERN, JJ., concur in the result.

*Reported in 450 P.2d 947.