[No. 42112.    En Banc.    April 20, 1972.]

SEATTLE TIMES COMPANY, *Appellant*, v. GEORGE TIELSCH *et al., Respondents,* SLADE GORTON *et al., Appellants.*

*Davis, Wright, Todd, Riese & Jones, Charles H. Todd,* and *O. Yale Lewis, Jr.,* for appellant Seattle Times Company.

*Slade Gorton, Attorney General, J. Keith Dysart, Chief Deputy,* and *Jonathan Blank, Assistant,* for appellant Gorton.

*Christopher T. Bayley, Prosecuting Attorney,* and *Richard D. Eadie, Deputy,* for appellants Bayley et al.

*A. L. Newbould,* and *Lawrence K. McDonell,* for respondents.

*Gordon, Thomas, Honeywell, Malanca, Peterson, O'Hern & Johnson, Valen H. Honeywell, Ashley, Foster, Pepper & Riviera,* and *Paul P. Ashley,* amici curiae.

ROSELLINI, J.—This is a declaratory judgment action brought by the Seattle Times Company to obtain an adjudication that its "Guest-Guesser" football forecasting contest does not violate Seattle City Ordinance No. 16046. The original defendant was the police chief of Seattle, who, in his answer, prayed for a judgment that the contest violated the ordinance and also violated Const. art. 2, § 24,[1] and RCW 9.47.010. The parties stipulated to the addition of the City of Seattle as a party defendant and the court granted the city's motion to add the Attorney General, the Prosecuting Attorney for King County, and the King County Executive as additional defendants. By amended answer the police chief prayed for judgment that the contest also violated RCW 9.59.010 and Laws of 1971, Ex. Ses., ch. 280.

After a trial at which the Times presented evidence by contestants and experts concerning the amount of skill and judgment involved in successful competition in the contest and, in addition, presented evidence that no monetary consideration is paid for the chance to compete, other than the purchase price of the newspaper which carries coupons used in the contest, and that the contests are administered fairly with no deceptive practices, the trial court entered these significant findings:

II

Since 1939, and including 1970, plaintiff has sponsored a contest called "Guest-Guesser", the rules, entry forms and results of which are printed in plaintiff's newspaper, . . .

---

[1]Senate Joint Resolution No. 5, a constitutional amendment, to be submitted to the voters in the 1972 general election, would authorize the legislature to approve lotteries by a vote of 60 per cent of the members of each house. It also would allow authorization of lotteries by initiative or referendum.

## III

The contest has been conducted in accordance with said rules under which on nine consecutive weeks in the months of September, October and November plaintiff published a list of twenty football games to be played on the weekend of each of said nine weeks. All persons who have passed their twelfth birthdate, except plaintiff's employees and newspaperboys, may compete in the contest by forecasting the results of the games on coupons printed in plaintiff's newspaper. The rules provide that entries may be made on facsimiles of the same dimensions as the printed coupons with the teams listed in exactly the same sequence. Squares for each team and ties must be drawn so that the square on the facsimiles line up exactly with those on the printed coupon. Reproductions made by duplicating devices, including carbon paper are not eligible. A facsimile made under these requirements takes about twenty minutes to prepare. During 1970 an average of about 35,000 entries was received by plaintiff during each of the nine qualifying weeks. Some contestants spend fifteen to twenty hours each week in preparing their selections for entry and submit as many as twenty-five each week.

## IV

The contest was designed, in part at least, to stimulate interest in plaintiff's newspaper. Plaintiff considers the contest to be entertaining and of interest to readers. The financial success of plaintiff depends upon the sale of its newspapers and its advertising revenue. Advertising revenue increases in proportion to increased circulation.

## V

There is no evidence that the "Guest-Guesser" contest has a discernible effect on the circulation of the Seattle Times, although one witness has testified to purchasing copies in order to obtain "Guest-Guesser" coupons. The "Guest-Guesser" contest creates reader interest and this is financially beneficial to the Seattle Times Company.

## VI

Plaintiff, under its rules, offered to pay $1,000 to a contestant who submits twenty correct predictions in a single qualifying week, and plaintiff did pay said sum on three occasions during the 1970 contest. One Hundred Dollars ($100.00) is paid to each week's high scorer or is divided among the week's high scorers. Persons who have the best and second-best scores during the qualify-

ing weeks may submit an entry for the final week's contest, the winner of which is awarded a trip for two persons to the Rose Bowl or Super Bowl.

## VII

The result of a football game may depend upon weather, the physical condition of the players and the psychological attitude of the players. It may also be affected by sociological problems between and among the members of a football team. The element of chance is an integral part of the game of football as well as the skill of the players.

## IX

The lure of the "Guest-Guesser" contest is partially the participant's love of football, partially the challenge of competition and partially the hope enticingly held out, which is often false or disappointing, that the participant will get something for nothing or a great deal for a very little outlay.

## X

Judgment, skill and knowledge—of which there is a great amount—are not necessary to the "Guest-Guesser" contest. All they do is define the contestants. They eliminate the participants who are not oriented to football, or who do not have at least a heavy interest in football, and who are not sufficiently interested and oriented to take the time and trouble to do some studying with respect to it. After the contestants are identified by their expertise and knowledge, everything else is chance. No one will ever win the contest without skill but neither will anyone win without chance.

Upon these findings the trial court concluded:

Each of the elements of prize, consideration and chance is an integral part of plaintiff's contest when viewed as an entire activity and judgment should be entered in favor of defendants George Tielsch and The City of Seattle declaring that said "Guest-Guesser" contest is in violation of Section 24, Seattle Ordinance 16046, Section 25, Seattle Ordinance 16046, RCW 9.59.010, RCW 9.47.010.

An appeal was allowed directly to this court. Other leading newspapers of the state, namely the Seattle Post-Intelligencer (joined by a number of smaller newspapers), and The Tacoma News Tribune, were permitted to file amicus curiae briefs, supporting the position taken by the Times

and opposing the judgment. In addition, the Attorney General, the Prosecuting Attorney for King County, and the King County Executive have filed a brief in which they too oppose the judgment.[2]

The police chief and the City of Seattle have filed the only brief before us which supports the decision of the trial court. Nevertheless, we are satisfied that under the principles previously laid down by this court concerning the elements which establish the existence of a lottery, the trial court was correct in holding that the contest in question is a lottery within the meaning of the ordinance and RCW 9.59.010.

The state constitution, article 2, section 24, provides that the legislature "shall never authorize any lottery." Pursuant to the policy expressed by the people in this constitutional provision, the legislature enacted RCW 9.59.010, and its subordinate, the City of Seattle, enacted its ordinance No. 16046, section 24, of which provides:

> 12.11.250 Lotteries and prize packages. It is unlawful for any person to open, conduct, maintain or carry on, or be in any manner connected with, any lottery or any establishment or business, by whatever name it may be known, wherein any property is sold or disposed of by chance, or to sell or dispose of any lottery ticket or share, either for religious or secular purposes, or any chance, or any article or thing entitling, or purporting to entitle the purchaser to any chance, or to sell or dispose of any package or article purporting to contain a prize, or where, as an inducement to purchase, it is held out that such article or package may contain a prize or may entitle the purchaser to some article or thing of value not directly contemplated and known in the purchase.

RCW 9.59.010 contains a less detailed definition of a lottery:

> A lottery is a scheme for the distribution of money or property by chance, among persons who have paid or agreed to pay a valuable consideration for the chance, whether it shall be called a lottery, raffle, gift enterprise,

---

[2]We are not favored with an explanation of the interest of the state and county in supporting football forecasting contests.

or by any other name, and is hereby declared unlawful and a public nuisance.

■ The elements of a lottery are prize, consideration and chance. *State ex rel. Schillberg v. Safeway Stores, Inc.*, 75 Wn.2d 339, 450 P.2d 949 (1969). We said in that case that where the elements of prize and chance are present, the courts will examine the game to see if consideration in any form actually moves from the participants to the promoter, and we held that any consideration sufficient to support a contract is sufficient to satisfy the requirement. This view is also taken in the only treatise upon the subject of lotteries which we have been able to discover, F. Williams, Flexible Participation Lotteries (1938). The author at page 275, section 278, says that the lottery, although not itself a contract but rather a unilateral creation, is nevertheless contractual in its operation. He says:

> It is designed to induce many contracts. The entire scheme is presented to the public as a general offer. The scheme prescribes the conditions of acceptance. These conditions require the acceptors to pay something or do something, or both.

For a listing of other jurisdictions which have adopted this theory, *see* 29 A.L.R.3d 888, *Promotion schemes of retail stores as criminal offense under antigambling laws.*

In the Times' football forecasting contest, the participants are not required to purchase chances (although they must, of course, purchase at least one newspaper or obtain one purchased by someone else), but they are required to do something, and the thing which they are required to do involves many hours of a participant's time if he is to have any hope of success. He gives his time and his attention to the Times' contest. This is termed by the Times itself as "reader interest." It does not deny that "reader interest" is stimulated. It disclaims any great benefit to itself flowing from this stimulated interest but claims that it is exceedingly beneficial to the contestants, giving them something to do with their time which presumably would otherwise be wasted or consumed in mischievous undertakings.

While the exact extent of the benefit received by a newspaper which conducts one of these contests is not revealed in the record, that there is such a benefit cannot be doubted.

It is perhaps true that the contestants do not feel that they are giving up anything of value to participate in the contest.

As a matter of fact, the participant in any lottery is likely to feel that the small amount which he contributes for a chance to receive much more is well worth the risk. But the people of this state when they framed the constitution, the statutes, and the ordinances, recognized that the gambling instinct is strong in human nature and enacted these provisions to protect themselves from their own inclination to engage in self-deception when that instinct is stirred. Consequently, the opinion of a participant that he has not given up anything of value is not determinative, and as we said in *State ex rel. Schillberg v. Safeway Stores, Inc., supra,* if the participant is required to do something which he might not otherwise do, and if there is in fact a benefit flowing to the promoter, which induces him to make the offer, the requirement of consideration is met, provided, of course, that the elements of chance and prize are present.

■ The appellant acknowledges that under the rule of that case, consideration can be found to exist in this case, but it earnestly urges that the element of chance is lacking.

> Chance within the lottery statute is one which dominates over skill or judgment. The measure is a qualitative one; that is, the chance must be an integral part which influences the result. The measure is not the quantitative proportion of skill and chance in viewing the scheme as a whole.

*Sherwood & Roberts—Yakima, Inc. v. Leach,* 67 Wn.2d 630, 634, 409 P.2d 160 (1965).

The appellant maintains that chance is not a dominant element in football forecasting contests and that its evidence clearly established this to be the fact. The trial court

found to the contrary upon that evidence, and we think the finding is justified. The appellant's expert statistician who testified at the trial did not state that chance plays no part in the outcome of such a contest or even that it does not play a dominant role. He merely testified that such a contest is not one of "pure chance." Pure chance he defined as a 50-50 chance. He acknowledged that a contestant who consistently predicted the outcome of 14 out of 20 games correctly would be a "highly skilled" contestant.

In *State ex inf. McKittrick v. Globe-Democrat Publishing Co.*, 341 Mo. 862, 110 S.W.2d 705 (1937), the court considered a multiple entry contest involving the selecting of the most appropriate titles for cartoons drawn by Peter Arno, the title to be chosen from a list accompanying the publication of each cartoon. The evidence showed that, with respect to almost all of these cartoons, the most appropriate titles could be agreed upon; but for a very few, two equally appropriate titles were proposed, one of which had been chosen as the correct title by a panel of supposedly disinterested judges. The court held that the element of chance entered the contest at this point, if not before, and that it was a substantial element. It said:

> It is impossible to harmonize all the cases. But we draw the conclusion from them that where a contest is multiple or serial, and requires the solution of a number of problems to win the prize, the fact that skill alone will bring contestants to a correct solution of a greater part of the problems does not make the contest any the less a lottery if chance enters into the solution of another lesser part of the problems and thereby proximately influences the final result. In other words, the rule that chance must be the *dominant* factor is to be taken in a qualitative or causative sense rather than in a quantitative sense. This was directly decided in Coles v. Odhams Press, Ltd., supra, [[1936] 1 K.B. 416] when it was held the question was not to be determined on the basis of the mere proportions of skill and chance entering in the contest as a whole.

341 Mo. at 881.

Our research has revealed only one case involving a foot-

ball forecasting game and the game there was a "pool," that is, a gambling game wherein wagers were placed. The Superior Court of Pennsylvania held that it was a lottery. What is most relevant in the case for our consideration here is the court's discussion of the element of chance in forecasting the result of football games. That court said:

It is true that for an avid student of the sport of football the chance taken is not so great as for those who have little interest in the game. However, it is common knowledge that the predictions even among these so-called "experts" are far from infallible. Any attempt to forecast the result of a single athletic contest, be it football, baseball, or whatever, is fraught with chance. This hazard is multiplied directly by the number of predictions made. The operators of the scheme involved in this case were well cognizant of this fact for the odds against a correct number of selections were increased from 5 to 1 for three teams picked up to 900 to 1 for fifteen teams.

*Commonwealth v. Laniewski*, 173 Pa. Super. 245, 249, 98 A.2d 215 (1953).

The trial court in the instant case recognized the same basic realities attendant upon the enterprise of football game-result forecasting. We are convinced that it correctly held that chance, rather than skill, is the dominant factor in the Times' "Guest-Guesser" contest. The very name of the contest conveys quite accurately the promoter's as well as the participants' true concept of the nature of the contest.

We conclude that the contest, however harmless it may be in the opinion of the participants and the promoters, is a lottery within the definitions contained in RCW 9.59.010 and Seattle City Ordinance No. 16046, § 24.

However, we find no support, either in the findings or in the record, for the proposition that the "Guest-Guesser" contest violates section 25 of the ordinance, or RCW 9.47.010 (repealed by Laws of 1971, Ex. Ses., ch. 280) or the 1971 law. All of these involve a wager of something of monetary value. We are convinced that the contest is not a gambling game within the meaning of these statutes.

As thus modified, the judgment is affirmed.

HAMILTON, C.J., HUNTER, HALE, NEILL, STAFFORD, and WRIGHT, JJ., concur.

FINLEY, J.—I dissent. I cannot believe that either the framers of the constitution in drafting Const. art. 2, § 24, the state legislature in enacting RCW 9.59.010, or the Seattle City Council in enacting ordinance No. 16046, section 24, intended to prohibit innocent contests of this nature. Furthermore, the views of the *present* city and state authorities on this matter are amply demonstrated by the fact that the state Attorney General, the Prosecuting Attorney for King County, and the King County Executive have filed briefs in which they oppose the trial court's judgment that the "Guest-Guesser" contest is illegal. I believe that the framers of our constitution would have joined in those briefs if they were with us today and had been given the opportunity to do so.

I am convinced that members of the governmental bodies responsible for the above-described enactments would be shocked to hear that the "Guest-Guesser" contest qualifies as a lottery. What is missing from the contest are the essential elements of (1) out-of-pocket *consideration* paid by the participant for the privilege of playing the game, and (2) *chance*.

The question of what kind of consideration (if any) flowing from the participant is necessary to constitute a lottery is not directly answered by the controlling constitutional and statutory provisions. Resort to the dictionary provides the would-be interpreter with two possible meanings: (1) an "allotment or distribution of anything by fate or chance," or (2) "specifically, a scheme for the distribution of prizes by chance, in which a number of tickets are *sold*, one or more of which draw prizes." (Italics mine.) Webster's New 20th Century Dictionary, 1069 (2d ed. 1960). The constitution and the relevant statutes provide no guidelines for choosing between these definitions. Since the prohibition is essentially penal in nature, *D'Orio v. Jacobs,* 151

Wash. 297, 275 P. 563 (1929), it becomes our role to find the narrowest interpretation of the constitutional prohibition which is consistent with the intent of the framers and the ongoing societal interest in preventing conduct harmful to individuals or to the state.

I submit that posing the problem this way requires adoption of the narrower definition of the term "lottery." Gambling is harmful to the individual when he suffers inordinate loss of money or property, not before. If a person does not have to pay to play, he stands only to lose his time, and control of a person's disposition of his time is not traditionally (or even recently) a function of the government. Indeed, even the mention of such activity on the part of government should be sufficient to raise the now dormant specter of substantive due process.

In public policy terms, therefore, it is difficult to imagine that the constitutional prohibition against lotteries was aimed at anything other than the *selling* of chances to win prizes. The prohibition is designed to prevent impoverishment of the unwary and to prevent the public from wagering their money and property upon fortuitous events. *State ex rel. Schillberg v. Safeway Stores, Inc.,* 75 Wn.2d 339, 450 P.2d 949 (1969).

Admittedly, such a construction runs contrary to the *holding* of this court of *Safeway,* wherein we concluded that Safeway's "Bonus Bingo" game was illegal, that the expenditure of time, energy, and money on the part of the contestant and the benefits of increased sales, good will, and public interest accruing to Safeway were sufficient consideration to turn the game into a lottery prohibited by the constitution. In view of the fact that many essentially harmless activities are rendered illegal by the application of contractual consideration principles to a constitutional lottery prohibition, I believe this court should reexamine its definition of consideration in the *Safeway* case and replace it with an out-of-pocket substantial expenditure test.

However, even if the court is disinclined to follow this course of action, I am convinced that the "Guest-Guesser"

contest should not be proscribed, for it is *not* a distribution of money or property by chance. If the court continues to believe that consideration in the form of time and mental effort invested in the "Guest-Guesser" contest is a sufficient element of a lottery, the court should, nevertheless, conclude that the requisite element of chance is missing from the contest.[3] I believe that the various anti-lottery provisions applicable to this case represent nothing more than the attempted codification of the moral view that the distribution of anything *by pure chance* is immoral and should be made illegal. Any other view contravenes the relevant legislative intentions, and is certain to lead to inconsistencies and absurdities in application.

Under this point of view the result in *Safeway* is a correct one, since "Bonus Bingo" purported to distribute money on the basis of chance alone. But a different result would be required in the instant case since success in the "Guest-Guesser" contest, like success in many enterprises of life, requires the application of a considerable amount of knowledge and skill, as the trial court recognized in concluding that "no one will ever win the contest without skill . . ."

In summary, there are two possible interpretations of the anti-lottery provisions applicable to the instant case. Either these provisions are designed to prohibit the distribution of prizes by chance in return for *valuable out-of-pocket consideration* paid by the participants, in which case the result in *Safeway* is wrong and the outlawing of the "Guest-Guesser" contest is equally wrong; or the anti-lottery provisions are designed to prevent *any* distribution based on chance, whether or not money is paid for the right to participate, merely because the receipt of a prize without any concomitant expenditure of physical or mental skill or energy is somehow immoral. Under this interpretation,

---

[3]There is an element of contradiction in the apparent conclusion of the majority opinion that invested time and mental effort are sufficient to constitute consideration flowing from the participant, but are insufficient to make the game one of skill rather than chance.

the result in *Safeway* stands, since the application of physical or mental skill to the "Bonus Bingo" game was minimal.

The majority opinion adopts the second interpretation, but then, following the standards set out by this court in *Safeway*, goes on to hold (1) that in order to be purged of moral taint sufficient to become legally consistent with the (questionably assumed) legislative intent behind the anti-lottery provisions, a contest must be designed so that chance is not the dominant element; and (2) that under this criterion the "Guest-Guesser" contest is an illegal lottery.

To begin with, I disagree with the "dominance" test adopted by the majority. I do not believe that this or any other court will ever be able to develop a workable scheme for determining whether chance is the dominant element in a particular contest. The relevant question should be whether any substantial degree of skill or judgment is required in a contest. If it is, that contest is not a lottery. *State v. Coats*, 158 Ore. 122, 74 P.2d 1102 (1938). Going beyond this point to require a preponderance of skill not only opens up definitional problems, but also does violence to the legislative intent as I understand it. Once the out-of-pocket consideration requirement has been read out of the law, the most reasonable remaining justification for the lottery prohibition, as applied to participants who pay no money or property for the right to play, is a moral belief that receiving something without working or thinking in order to get it is somehow wrong, and that any contest or system which distributes money or property in a manner bearing *no* relationship to the skill or effort expended by the participants should be illegal. Clearly, the expenditure of any substantial amount of skill or effort overcomes the "something for nothing" objection. Under this test, the "Guest-Guesser" contest is clearly not a lottery. The trial court found that no one could win it without skill. The contest therefore does not offend the legislative intent or violate the anti-lottery provisions.

Again, as in the case of the contractual consideration

requirement, this desirable revision of the law would require modification of the *Safeway* decision, wherein a *predominance* of skill *was* held to be necessary to place a contest outside of the lottery prohibition.

However, even if the "dominance" test of *Safeway* is followed (and regardless of whether or not the *Safeway* contractual consideration concept is maintained), I do not believe that the "Guest-Guesser" contest is an illegal lottery under the "dominance" standard. The Supreme Court of Michigan has stated that football itself is not a game of chance. *Rohan v. Detroit Racing Ass'n,* 314 Mich. 326, 22 N.W.2d 433, 166 A.L.R. 1246 (1946). This conclusion fails to be totally obvious only because the results of a particular football game (or a number of them) often appear to be unknowable in advance. Closer examination reveals, however, that this apparent unpredictability is in large measure due not to *chance or luck,* but to the participant's *lack of sufficient skill and information* to evaluate a complex series of interacting causes of the final outcome. A true game of chance, or a true lottery, is subject only to the mathematical principles of probability. In a true lottery, in Safeway's "Bonus Bingo" game, or in a game of roulette, no amount of skill or application of intellect will enable a participant to foretell the outcome. The outcome of an honestly conducted lottery is not predictable, either in theory or in fact. But in the "Guest-Guesser" contest, the contingencies which determine the outcome of the games to be picked are, theoretically, and to a large extent practically determinable. A sufficient level of skill would *ensure* success. It is a game of skill, but because the level of skill necessary to ensure success is rarely, if ever, present, it appears to be a game of chance. It is worthwhile to note that such a high degree of difficulty is probably essential in any game of skill with large numbers of participants. The outcome of such a game *must* be based on difficult to predict contingencies. Otherwise there would be too many winners. For example, the crossword puzzle contest of the Seattle Post-Intelligencer appears to be a word game based on skill. But

to reduce the class of winners to a manageable number, the clues must be deliberately made ambiguous. No one has sufficient skill to choose invariably the correct word from these clues. Will that contest therefore be the next victim of irrational moral crusading?

I am convinced that the majority's application of the "dominance" test in outlawing the "Guest-Guesser" contest has potentially disastrous consequences. Our society is full of "contests" involving predictions as difficult and contingencies as complex as those in the "Guest-Guesser" contest. Consider the stock market. Success in the market depends upon skill, but are not the contingencies involved in making the necessary predictions fully as complex as those in the "Guest-Guesser" contest, and the results therefore as unpredictable and as seemingly dependent upon chance?

More specifically, one could read in the New York Times for January 16, 1972, of "The Great Money Game," a contest sponsored by the Chase Manhattan Bank, wherein a number of New York stockbrokers were invited to take a hypothetical $100,000,000 and attempt to increase it as much as possible over a period of a year by stock market investment. The financial rewards (prize) to the winner were substantial. The effort expended by the contestants (consideration) was large. Would the undeniable difficulty of predicting all the factors which would lead to success require the prohibition of this game in the state of Washington?

Finally, in view of the fact that the list of examples of similar "contests" in our society could be extended almost indefinitely, I believe it is our duty to recall the language of this court in *D'Orio v. Jacobs*, 151 Wash. 297, 275 P. 563 (1929):

> This is a penal statute and must be strictly construed, and we find in it no attempt to forbid games of skill or to bar the ordinary chance or contingency which is involved in practically every human endeavor.

The element of apparent unpredictability and chance in the "Guest-Guesser" contest is similar to that which exists in

many activities of life—finding a job, being elected to office, winning a football game. These activities also have rewards or "prizes." Should they also be declared illegal? Is life itself, by logical extension, an illegal lottery?

In view of these considerations, the enactors of the lottery prohibitions could only have intended, and it is the duty of this court to hold, (1) that an illegal lottery will be found to exist only where no substantial application of mental or physical skill is required; (2) that even if it is required that skill be the *dominant* factor, the inputs of time, thought, and skill needed to win the "Guest-Guesser" contest are sufficiently great to place it outside the scope of the applicable anti-lottery provisions; and (3) that this type of contest (involving results which *can* be predicted with skill, and *cannot* be predicted without skill) is clearly distinguishable from the pure chance lottery of *Safeway*. The intent of the enacting bodies was to strike at the substantial out-of-pocket cost of pay-to-play normal gambling, and (according to *Safeway*) at the immorality of pure-chance, "something for nothing" lotteries—not at free games of skill.

The "Guest-Guesser" contest is a game of skill. It is not a gambling game. It does not appeal to the gambling spirit. It is a wholesome exercise which allows citizens of widely varying economic and educational backgrounds to compete on turf where one's skill is independent of one's educational preparation. It contains no discernible evidence of harm. Richard Emerson, a regular contestant in the "Guest-Guesser" contest, put the matter well at trial:

> This is my hobby. I do very little in the winter here. I don't snow ski. I don't do much of anything except watch football on T.V. I'm not a winter sports fan. I wonder why I live here. But I do this as a hobby. I look forward to it. It's my personal little thing that I do. Some people golf. I like to play football contests. Not for the money. It's for the privilege of just being able to play and to know that I can win.

This type of contest lacks the ill effects which concerned

the framers of the Washington State Constitution and the legislators who proscribed lotteries.

For this court to go beyond what seems to me to be the most common-sense interpretation of the legislative intent and to interpret the applicable provisions as outlawing contests like the "Guest-Guesser" game, would be to set an unfortunate and unnecessary precedent. After such a holding, the court will find itself on a confusing and frustrating trek down a road of inescapable logic paved with luck and skill mingled contests, throwing these contests into a judicially dug ditch of dubious illegality, at the expense of common sense and in contravention of the values and intent of the drafters of the statutes and of the citizens of this state.

I cannot agree with such a result. I would declare the "Guest-Guesser" contest legal.