Honorable Michael Heavey Senator 34th Legislative District P.O. Box 40482 Olympia, Washington 98504-0482
Dear Senator Heavey:
By letter previously acknowledged, you have requested our opinion as to whether Initiative Measure No. 671, a ballot measure expected to be on the November 1996 ballot, would require a sixty percent affirmative vote in order to be enacted. You have requested an expedited answer.
We answer your question in the affirmative: to be properly enacted, Initiative 671 would require approval of a sixty percent majority of the voters.
 ANALYSIS A. Procedural Background of the Initiative.
Initiative 671 is an initiative to the people on the subject of tribal gaming.[1] In accordance with article 2, section 1, of the state constitution, the proponents of this measure have submitted petitions with signatures sufficient in number to qualify the measure for the November 1996 ballot.[2]
The passage of the initiative would constitute approval of changes in state law permitting Indian tribes to conduct certain forms of gambling on Indian lands located within the state of Washington, notably "electronic gaming devices" which would include slot machines and other electronic or electromechanical gambling devices. Initiative 671, section 3 (proposed compact), part I, subsection (5).[3]
Ordinarily, an initiative is enacted if approved by a majority of the voters. Const. art. II, § 1(a). However, article 2, section 24, of the state constitution provides, in relevant part, that:
 Lotteries shall be prohibited except as specifically authorized upon the affirmative vote of sixty percent of the members of each house of the legislature or, notwithstanding any other provision of this Constitution, by referendum or initiative approved by a sixty percent affirmative vote of the electors voting thereon.
(Citations omitted, emphasis added.)
In Farris v. Munro, 99 Wn.2d 326, 662 P.2d 821 (1983), the state Supreme Court ruled that Amendment 56 (the amendment adopting the language just cited) was properly adopted, and that it had the effect of requiring an enhanced (sixty percent) majority for "lottery" legislation but did not otherwise repeal or amend article 2, section 1.
 B. Constitutional Definition of "Lottery."
The background of article 2, section 24, of the state constitution is the original language of this section in the 1889 Constitution: "The legislature shall never authorize any lottery or grant any divorce."
In a series of cases construing this language, the state Supreme Court found that this prohibition against lotteries was self-executing and that the term "lottery" was intended to have a broad meaning. The leading case in this regard is State ex rel.Evans v. Brotherhood of Friends, 41 Wn.2d 133, 247 P.2d 787
(1952), in which the court declined to interpret the intent of the state constitution to prohibit only "chartered" or "ticket" lotteries. Relying primarily on the broad meaning of the phrase "any lottery," the court stated:
 We think that in Art. II, § 24, the framers of our state constitution intended to outlaw all lotteries. The policy inherent in the provision is a broad one, aimed not at specific kinds or types of lotteries operated by means of tickets, roulette wheels, or involving other particular methods of operation.
Id. at 147-148.
The court went on to find that slot machines were a form of mechanical lottery, first noting cases of other states so holding and then making the following observation:
 We are firmly of the opinion that slot machines of the variety here involved, their operationsingly and collectively are mechanical lotteries. The machines constitute mechanical devices which dispense with the necessity of tickets and salesmen, and possibly, other details mechanical or otherwise which are generally necessary in the operation of lottery schemes or plans. The scheme or plan involved, rather than any mechanical device employed, constitutes the gist of the question, and determines whether a particular operation constitutes a lottery.
Id. at 152, (italics in the original). The court therefore held unconstitutional a law which would have allowed slot machines in private or nonprofit clubs.
In Sherwood Roberts — Yakima, Inc. v. Leach, 67 Wn.2d 630,409 P.2d 160 (1965), the court found that an advertising promotion scheme offering purchasers of certain equipment the chance to get the purchase price refunded was a "lottery" prohibited by the state constitution, be cause the elements of prize and consideration were present, and chance dominated over skill in determining who would successfully get a refund. And in State exrel. Schillberg v. Safeway Stores, Inc., 75 Wn.2d 339,450 P.2d 949 (1969), the court invalidated a grocery store "Bonus Bingo" promotion as a lottery even though players did not have to pay money or make a purchase to win.
These cases with their broad construction of the term "lottery" were the background as the Legislature in 1972 proposed an amendment to article 2, section 24. In place of the original categorical prohibition of lotteries, the Legislature proposed language that "lotteries shall be prohibited except asspecifically authorized" by either a sixty percent majority of both houses of the Legislature or sixty percent approval by the people in an initiative or referendum. It is evident that, in approving this amendment to the state constitution, the people did not intend to alter the definition of the word "lottery," but merely to provide a mechanism for approving some forms of "lotteries."[4]
Based on this case law, we conclude that slot machines and other "electronic gaming devices" which Initiative 671 would authorize would constitute lotteries as defined in the state constitution. Therefore, unless such "lotteries" have already been "specifically approved" in the manner described in article 2, section 24, a sixty percent vote would be required for such legislation to be effective.
 C. Effect of Previously Approved Types of Lotteries.
Although some forms of "lottery" have been approved under article 2, section 24, of the state constitution, none of the laws enacted to date covers the type of "lotteries" described by the term "electronic gaming devices" in Initiative 671.
Since Amendment 56 first permitted the approval of lotteries, the Legislature has approved two major laws permitting forms of gambling, in addition to some minor amendments to these laws. The first was the Gambling Act of 1973, primarily codified as RCW Title 9 and enacted originally as chapter 218, Laws of 1973, 1st Ex. Sess.[5] This legislation authorized and regulated a number of forms of gambling that met the constitutional definition of "lottery," including bingo, fishing derbies, pull-tabs, and certain raffles, but it did not authorize slot machines or other "mechanical" lotteries. Section 2(9) of the 1973 Act defined the term "gambling device" and section 23 declared all such devices to be common nuisances and subject to seizure. Subsequent amendments have continued this prohibition.[6]
Subsequently, the 1982 Legislature enacted legislation creating a State Lottery. Laws of 1982, 2nd Ex. Sess., ch. 7.[7] This legislation, now codified in chapter 67.70 RCW, permits a traditional "ticket" or "share" lottery. See, e.g., RCW 67.70.040, .110, .120, .180, .200. Other "lotteries" such as slot machines and video poker are not mentioned in chapter 67.70 RCW, and the prohibitory language of chapter 9.46 RCW was not altered or repealed by the State Lottery Act.
Since the state constitution permits only such lotteries as have been authorized by the special sixty percent majorities mentioned in article 2, section 24, and since Initiative 671 would authorize types of lottery never previously approved, we conclude that, as a matter of state constitutional law, Initiative 671 would require a sixty percent majority vote to be effective.
 D. Federal Preemption.
Since the evident purposes of Initiative 671 is to expand the possible scope of tribal gaming conducted pursuant to the Indian Gaming Regulatory Act ("IGRA"), we also considered the possibil ity that IGRA or other federal law somehow preempts article 2, section 24, of the state constitution. Our consideration led us to reject the possibility, however.
IGRA does not change state laws regarding gambling, or purport to limit the ability of states to change their own laws and policies on this subject. Nor does IGRA purport to define procedurally how states will enact or amend laws on the subject of gaming. Rather, IGRA limits tribal-state compact negotiations to gaming permitted under state law. Thus, 25 U.S.C. § 2710(d) makes Class III gaming lawful on Indian lands only if such activities are, among other things,
 (B) located in a State that permits such gaming for any purposes by any person, organization, or entity, and (C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.
25 U.S.C. § 2710(d). Paragraph (3) describes a process by which tribes and states will conduct their negotiations.
The federal courts have held that IGRA was not intended to preempt state-adopted restrictions on types of gambling,[8] including restrictions adopted after IGRA's 1988 enactment. In Coeur d'AleneTribe v. State of Idaho, 842 F. Supp. 1268 (D. Idaho 1994), the courts upheld Idaho's right to adopt a newer, more restrictive gambling policy by state constitutional amendment in 1992, and held that the newer policy governed state-tribal negotiations for compacts for Class III gaming concluded after enactment of the state constitutional amendment. The court rejected the argument that IGRA precludes states from changing their gaming laws prior to entering into a compact, finding that:
 Under IGRA, the law and public policy of the state set the scope of permissible Class III gaming on tribal lands. IGRA certainly does not command that a state may not change its gaming laws or amend its constitution prior to entering into a compact. There is nothing in IGRA which would prevent Idaho from abolishing and criminally prohibiting all Class III gaming entirely.
Id. at 1276. The Ninth Circuit affirmed in Coeur d'Alene Tribe v.State of Idaho, 51 F.3d 876 (9th Cir. 1995), adopting the trial court's reasoning.
The federal courts have also upheld the authority of states to define procedurally how they will conduct their compact negotiations. In Kickapoo Tribe v. Babbitt, 43 F.3d 1491 (D.C. Cir. 1995), the Court of Appeals found that IGRA did not affect the right of the state of Kansas to define which state officers had authority to enter into a compact, and found that the governor lacked such authority absent state legislation defining and delegating such power. Similarly, in both Apache Tribe of theMescalero Reservation v. State of New Mexico, No. 92-0076 JC/WWD (N.M. June 6, 1996), and in Pueblo of Santa Ana v. Kelly, No. 96-0002 MV/WWD (N.M. July 12, 1996) federal judges found that New Mexico state law defined who could conduct tribal gaming compact negotiations on behalf of the state, invalidated compacts concluded by the governor without legislative approval,[9] and found that tribes in New Mexico had no authority to conduct Class III gaming operations without compacts.
If IGRA leaves undisturbed the right of the states to set their gambling policies (including the right to change those policies from time to time), and leaves to states the authority to decide proce durally how they will negotiate tribal gaming compacts, then, a fortiori, IGRA preserves the right of a state to define how many votes it will require to effect a change in state law. Article 2, section 24, of the state constitution was approved 16 years before IGRA was enacted and sets the same proce dural requirements for the approval of all lotteries, no matter who will conduct them.
We therefore conclude that Initiative Measure 671 will, to be enacted, require a sixty percent majority of those voting on the measure in the November 1996 election.
Very truly yours,
CHRISTINE O. GREGOIRE Attorney General
JAMES K. PHARRIS Senior Assistant Attorney General
[1] Current state law uses the term "gambling," while the initiative, consistent with the federal Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et seq., uses the term "gaming." The two terms may have technically distinct meanings in some contexts, but will be used interchangeably in this discussion.
[2] The text of the initiative is attached as Appendix A.
[3] The initiative would impose a number of conditions and limitations on the gaming to be conducted: these details are beyond the scope of this discussion.
[4] The Explanatory Statement in the Voters Pamphlet for the proposed amendment repeated the definition of "lottery" from the cases as "any scheme or activity which does not involve a substantial amount of skill and does possess all three of the following elements: (1) prize, (2)chance, and (3) consideration." Voters Pamphlet 41 (1972). The statement went on to describe the effect of Senate Joint Resolution (SJR) 5 (the legislation which when approved by the voters amended article 2, section 24, of the constitution) in the following terms:
 This proposed constitutional amendment would repeal the present total prohibition against any sort of lotteries and would substitute a qualified prohibition which would allow any activity which constitutes a lottery . . . to be conducted in this state after there has been a specific authorization by either (1) an act of the legislature approved by sixty percent of the members of both houses or (2) an initiative or referendum approved by sixty percent of the electors voting thereon.
The Explanatory Statement specifically listed slot machines as among the forms of gambling which could be permitted with a sixty percent vote if the people adopted the amendment. The appellate courts have not had occasion to construe the meaning of "lottery" since amendment 56 was approved, but the history and circumstances make it clear that no change in definition was intended.
[5] This legislation obtained a sixty percent majority in both houses of the Legislature. Senate Journal, 43rd Legislature (1973) at 1511; House Journal, 43rd Legislature (1973) at 2815.
[6] The current statutory definition of "gambling device" as contained in RCW 9.46.0241 specifically includes slot machines, video pull-tabs, video poker, and "other electronic games of chance." RCW 9.46.217 makes it a felony to own, manufacture, store, repair, transport or possess a gambling device in this State. RCW 9.46.231 makes all gambling devices subject to seizure and forfeiture.
[7] This legislation also passed both houses by more than a sixty percent vote. Senate Journal, 47th Legislature (1982) at 2718;House Journal, 47th Legislature (1982) at 1480.
[8] IGRA does preempt state law as to Class I gaming and preempts state regulation over Class II gaming. See 25 U.S.C. § 2710(a); (b).
[9] Compact negotiation in the state of Washington is governed by RCW 9.46.360.