508 S.E.2d 575

Joan Caldwell JOHNSON, Brice Anderson, Lorraine Witherspoon Baker, Faye Blaylock, Sara Edell Boan, Mike Brewer, Mike Brown, Ronald Callahan, Sandra Coulter, Lisa Crum, Andreas Drutis, Crystal Gayle Edwards, Darryl Bernard Epps, Buster Elfin Floyd, Deanna Kay Franz, William Joseph Harnett, Jr., George Henley, Loretta Jones, Margaret Locklear, Tammy Locklear, Linda McCleod, William McCormick, Hugh Meise, Patty Miller, Andrew Nobles, Gary Padgett, Mary Pinchback, Vardry Pittman, Albert J. Samra, Mason Skeenes, Danny Kaye Smith, Jim Stolz, Amber Strickland, Charles Stubbs, Lonya Thigpen, James Thompson, Joseph Chester Walker, Jessie Williams, Valerie Williams, and on behalf of themselves and all others similarly situated, Plaintiffs,

and

Charles Molony Condon, as Attorney General for the State of South Carolina, Intervenor,

v.

COLLINS ENTERTAINMENT CO., INC., Ace Amusement, LLC, American Amusement Co., Inc., American Amusement of Aiken, Inc., B & J Amusement, Best Amusement Co., Broyles & Lutz, Inc., CBA Games, Inc., Carousel Amusements, Coley, Inc., Drew Industries, Fast Freddies, Great Games, Inc., Greenwood Music Co., Inc., H & J of South Carolina, Inc., Holliday

Amusement Co. of Charleston, Inc., Hoyts Music Co., Inc., Huckleberry Amusement, Inc., Ingram Investments, J.M. Brown Amusement Co., Inc., Joytime Distributors & Amusement, Larry Wolfe Amusement, MHJ Corp., MHS Enterprises, Inc., Martin Coin Machine, Inc., McDonald Amusement Co., Midlands Gaming Corp., Orangeburg Amusement, Inc., Pedroland, Inc., R.L. Jordan Oil Co. of North Carolina, Red Dot Amusements, Rosemary Coin Machines of Florence, Inc., Scott's Vending Inc. of Columbia, Sumter Petroleum Co., Tim's Amusement, Inc., Video–Matic Amusements, Inc., H. Hugh Andrews, II, Pamela A. Andrews, Dwayne I. Bohannon, J.M. Brown, Don E. Broyles, Grace E. Coley, Fred Collins, J. Samuel Cox, Kenneth G. Flowe, Carey Hardee, Scott G. Hogue, Lowell E. Holden, Patricia Holliday, Warren P. Holliday, Henry E. Ingram, Steven E. Lipscomb, Tim Mahon, Jimmy Martin, Jr., Cynthia McDonald, James McDonald, Allan Schaefer, David R. Simpson, Ron Simpson, Mickey H. Stacks, William Darwin Wheeler, Hershel L. Williamson, and A.J. Wilson, Jr., in their individual and corporate capacities as representatives of all others similarly situated, Defendants.

No. 24858.

Supreme Court of South Carolina.

Heard April 8, 1998.
Decided Nov. 19, 1998.

Wilburn Brewer, Jr., of Nexsen, Pruet, Jacobs & Pollard, of Columbia; Lawrence Edward Richter, Jr., and Saul Gliserman, both of Richter Law Firm, of Mt. Pleasant; Robert R. Bridwell, of Columbia; Richard Mark Gergel, W. Allen Nickles, III and Carl Lewis Solomon, all of Gergel, Nickles & Grant, of Columbia; Joseph Preston Strom, Jr., and Tom Young, both of Strom & Young, of Columbia; and Richard K. Walker, of Phoenix, Arizona, for Plaintiffs Joan Caldwell Johnson, et al.

Attorney General Charles Molony Condon, Chief Deputy Attorney General John W. McIntosh, Deputy Attorney General Zeb C. Williams, III, Assistant Deputy Attorney General Robert Dewayne Cook, Assistant Attorneys General Reginald I. Lloyd and Christie Newman Barrett, all of Office of the Attorney General, of Columbia, for Intervenor the State of South Carolina.

Oscar William Bannister, Jr. and James W. Bannister, both of Hill, Wyatt & Bannister, of Greenville; Robert E. Blakely, of Notre Dame, Indiana; and Timothy Clayton Youmans, of the Collins Companies, of Columbia, for Defendant Collins Entertainment. Zoe Sanders Nettles, Dwight Franklin Drake, Robert Bruce Shaw, Benjamin Rush Smith, III and C. Mitchell Brown, all of Nelson, Mullins, Riley & Scarborough, of Columbia; A. Camden Lewis and Mary Geiger, both of Lewis, Babcock & Hawkins, of Columbia, for Defendants American Amusement Company, et al. David E. Belding, of

Columbia, for Defendants Red Dot Amusements, et al. Timothy Gene Quinn, of Columbia, for Defendant Carousel Amusement. Richard A. Harpootlian and Robert G. Rikard, both of Richard A. Harpootlian, P.A., of Columbia, for Defendant Coley, Inc. David E. Taylor, of Columbia, for Defendant B & J Amusement. Anne Sumner Douds, of Kiker & Douds, of Beaufort for Defendant Ingram Investments. John C. Lindsay, Jr., of Lindsay & Lindsay, of Bennettsville; and J. Boone Aiken, III, of Coleman, Aiken & Chase, P.A., of Florence, for Defendant Pedroland, Inc. Matthew A. Henderson, of Henderson, Brandt & Vieth, of Spartanburg, for Defendant R.L. Jordan Oil of North Carolina.

FINNEY, Chief Justice:

This matter is before the Court on certification from the United States District Court to answer the following questions.

1.  What are the factors to be considered and standards to be applied in determining whether a particular type of activity is a lottery as prohibited by the South Carolina Constitution?

2.  Do the Type II and Type III machines constitute lotteries in violation of the South Carolina Constitution? [1]

## PROCEDURAL HISTORY

Plaintiffs, purporting to represent themselves and others similarly situated, initiated this action for damages and injunctive relief in the State circuit court in June 1997. Defendants own or operate video gaming devices (video poker machines) under authority of licenses issued by the South Carolina Department of Revenue. Defendants removed the action to Federal District Court because the asserted claims included a cause of action under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 *et seq.* Subse-

---

1.  The machines at issue are all video gambling devices that are physically present and licensed for operation in this state as Class III machines (sub-types II and III) under S.C.Code Ann. § 12–21–2720(A)(3). Type II include the games of lotto, bingo and the traditional game of keno. Type III include games such as poker and black jack well as one variety of keno.

quently, additional plaintiffs and defendants were added, and the complaint was amended to allege that video poker games are being operated in violation of Article XVII, § 7 of the South Carolina Constitution, which prohibits lotteries.

In December 1997, the plaintiffs filed a motion for a preliminary injunction seeking to have the court enjoin the defendants from continuing to operate their video poker games because the games are illegal lotteries under the State Constitution and are violative of state statutes. The parties agreed that the constitutional issue could override the statutory issues. The South Carolina Attorney General has intervened and joined in the motion for injunctive relief. The District Court allowed the parties to engage in extensive discovery prior to a hearing on the motion for a preliminary injunction. Based upon evidence presented at the motion hearing, that Court made factual findings and issued an Order of Certification to the South Carolina Supreme Court pursuant to South Carolina Appellate Court Rule 228.

## ANALYSIS

Rule 228(b), SCACR,[2] contemplates that the South Carolina Supreme Court will base its answers to the questions certified exclusively upon the findings of fact by the District Court and, if necessary, the record in this matter.

In considering Question 1, we look to the applicable provision of the State Constitution, which reads:

No lottery shall ever be allowed or be advertised by newspapers, or otherwise, or its tickets be sold in this State. The game of bingo, when conducted by charitable, religious or fraternal organizations exempt from federal income taxation or when conducted at recognized annual State and

---

2. A certification order shall set forth the questions of law to be answered, all findings of fact relevant to the questions certified, and a statement showing fully the nature of the controversy in which the questions arose. The Supreme Court may request the original or copies of all or of any portion of the record before the certifying court to be filed with the Court, if, in the opinion of the Supreme Court, the record or a portion thereof may be necessary in deciding to accept or in answering the questions. Rule 228(b), SCACR.

county fairs, shall not be deemed a lottery prohibited by this section.

S.C. Const. art. XVII, § 7.[3]

The Constitution does not prohibit games of chance or gambling *per se;* with the exception that it is unlawful for public officials to engage in "gambling or betting on games of chance." S.C. Const. art. XVII, § 8. The framers of our Constitution clearly distinguished between "lottery" and "gambling or betting on games of chance." Adhering to the constitutional distinction, the South Carolina statutory scheme includes sections that specifically deal with lottery, gaming, and betting. *See, e.g.,* S.C.Code Ann. §§ 16–19–10 to 16–19–30 (lotteries); S.C.Code Ann. § 16–19–40 (prohibiting games of chance or gambling devices at state and county fairs); and S.C.Code Ann. § 16–19–60 (coin-operated pinball machines). This distinction between lottery and other forms of gaming, found within the text of the Constitution itself, supports the conclusion that its framers used the term "lottery" in a narrow sense. This conclusion accords with that of the South Dakota Supreme Court in a similar case:

[B]y separately stating the terms 'game of chance' and 'lottery,' the framers of the original [constitutional] provision intended the term 'game of chance' to be broad in scope, including most forms of gaming, and the term 'lottery' in the narrower sense contemplating the sale of tokens or tickets to large numbers of people for the chance to share in the distribution of prizes for the purpose of raising public revenue.

*Poppen v. Walker,* 520 N.W.2d 238, 245 (S.D.1994).

The Constitutional exemption for bingo [4] is consistent with a

---

**3.** Prior state constitutions included the following language similar to the current lottery prohibition provision. "Lotteries, and the sale of lottery tickets, for any purpose whatever, are prohibited, and the General Assembly shall prevent the same by penal laws." S.C. Const. art. XIV, § 2 (1868). "No lottery shall ever be allowed, or be advertised by newspaper, or otherwise, or its tickets be sold in this state; and the General Assembly shall provide by law at its next session for the enforcement of this provision." S.C. Const. art. XVII, § 7 (1895). In 1975, the constitutional provision prohibiting lotteries was amended and remains in effect to this date.

**4.** The game of bingo, when conducted by charitable, religious or fraternal organizations exempt from federal income taxation or when con-

narrow reading of the word "lottery" since bingo is commonly defined as a game derived from lotto, which in turn is based on lottery,[5] or a form of lottery often played simultaneously by hundreds or thousands of people.[6] However, the fact that bingo is generally considered a lottery, and meets the common definition of lottery, does not prove that other forms of gambling are lotteries. Further, it does not undermine the conclusion that the term lottery is narrowly construed.

The Court in *Rountree v. Ingle,* 94 S.C. 231, 77 S.E. 931 (1913),[7] distinguished lotteries from gambling by stating: "Our statute makes not only the promoter of a lottery, but the adventurers in it liable to indictment ... The purchaser of a lottery ticket in this State is therefore in a different plight from one who loses money in gambling ... who may recover the amount paid out."

The Court in *Darlington Theatres* characterized a lottery as a form of gambling which provided for the distribution of prizes by lot or chance. *Darlington Theatres, Inc. v. Coker,* 190 S.C. 282, 2 S.E.2d 782 (1939). While every lottery is a gaming device, not every gaming device is a lottery within the generally recognized meaning of the word. Accordingly, not all forms of gambling are violative of our constitution. In 1818, this Court narrowly construed the term "lottery" as "a term of art" noting that "otherwise it may mean any thing, as in common parlance it is applied to one half of the ordinary occurrences or accidents of life." *State v. Pinchback,* 9 S.C.L. 128 (2 Mill) (1818) The *Pinchback* Court emphasized the necessity of restricting application of the term lottery to only one class of adventures or hazards. In doing so, the Court stated that an activity "may be an adventure or hazard without a lottery; every throw of the die, even for an ordinary wager, is an adventure or hazard and I am sure it never yet

ducted at recognized annual State and county fairs, shall not be deemed a lottery prohibited by this section. S.C. Const. art. XVII, § 7.

5. Encarta 97 Encyclopedia (Microsoft deluxe ed. 1996).

6. 2 The New Encyclopedia Britannica 218 (15th ed. 1997).

7. The Court decided the question of plaintiff's right to ownership of a prize claimed by the defendant who recovered the winning lottery ticket after it had been discarded by the plaintiff. *Rountree v. Ingle, supra.*

entered the mind of any man that it constituted a lottery." *State v. Pinchback, supra.*

Likewise, the Court in *Darlington Theatres* found it apparent that "the constitutional and legislative prohibition is directed at a special type of vice in the fields of advertising and gift enterprises—the type that has come to be denominated both in the law and in common parlance by the word lottery." *Darlington Theatres,* 190 S.C. at 290, 2 S.E.2d at 786. The Court held the statutes enforcing the constitutional prohibition against lotteries were "undoubtedly directed at a particular type of gaming or gambling which has become commonly known as a lottery, and not the prohibition of games of chance of all kinds." *Id.*

The *Darlington Theatres* decision addresses the definition of lottery in some detail. The word lottery has no technical, legal meaning, but must be construed in the popular sense. *Darlington Theatres,* 190 S.C. at 292, 2 S.E.2d at 786. Lottery is "a species of gaming, which may be defined as a scheme for the distribution of prizes or things of value by lot or chance among persons who have paid, or agreed to pay, a valuable consideration for the chance to obtain a prize." *Darlington Theatres, supra.* The definition of lottery involves a "scheme for raising money by selling chances to share in a distribution of prizes; more specifically, a scheme for the distribution of prizes by chance among persons purchasing tickets, the correspondingly numbered slips, or lots, representing prizes or blanks, being drawn from a wheel on a day previously announced in connection with the scheme of intended prizes." 190 S.C. at 292–93, 2 S.E.2d at 787.[8]

Historically, in the early 1800's, a lottery was typically a government-sponsored means of raising revenue by selling tickets for prizes awarded by lot. *See* Ronald J. Rychlak, *Lotteries, Revenues and Social Costs: A Historical Examination of State–Sponsored Gambling,* 34 B.C.L.Rev. 11 (1992).

---

8. The dissent relies on the three element test of prize, consideration, and chance derived from our decision in *Darlington Theatres.* This test was used in *Darlington Theatres* to determine whether a drawing of signature cards qualified as an illegal lottery. The general character of the form of gaming in that case, a drawing with "tickets," was not in question. The issue there was simply whether a lack of consideration removed the scheme from the definition of a prohibited lottery.

A "lottery" in its narrowest sense is commonly defined as "a gambling game ... in which a large number of tickets are sold and a drawing is held for certain prizes." [9] Since its original ratification in 1868 the constitutional provision has specified "tickets" as part of the prohibited lottery activity. *See* 1868 S.C. Const. art. XIV, § 2. Use of the word "tickets" indicates the framers' narrow conception of a lottery as commonly understood, i.e., gambling involves "tickets" and a drawing by lot.

## CONCLUSION

We emphasize that the first question before this Court pertains to whether a particular activity is a lottery prohibited by the state constitution. The parties focus on the broader issue of chance. However, as the district judge noted in the Order of Certification, it is unnecessary to define the meaning of the term chance if this Court finds video gaming devices are not lotteries. We find lottery is a term of art and video gaming devices do not come within the plain and ordinary meaning of "lottery" because they do not involve a drawing and "tickets" or other indicium of entitlement to a prize.[10] We have made this finding based on the longstanding definitions and distinctions enunciated in *Darlington Theatres*, *Rountree*, and *Pinchback*. This Court is constrained to give the words of our Constitution their plain and ordinary meaning. *See Davis v. County of Greenville*, 313 S.C. 459, 443 S.E.2d 383 (1994) (language of constitution given its plain and ordinary meaning).

Question 2 asks us to apply the legal definition of lottery to preliminary findings of fact so that the conclusions of this Court may be considered by the District Court Judge in determining whether to issue a preliminary injunction. As stated in the Order of Certification, no finding of this Court will be binding for entry of any permanent injunction or for

---

9. Random House Dictionary of the English Language Second Edition Unabridged (1987).

10. Electronic ticketing would not necessarily preclude finding a lottery where electronic registration is the functional equivalent of a lottery ticket, i.e., evidence of one's entitlement to a prize over claims by competing ticket-holders.

the award of damages by the District Court. We answer the second question with the caveat that we are giving a response only to an interlocutory question of fact. Hence, the answer of this Court to Question 2 is that Type II and III machines do not constitute lotteries in violation of the South Carolina Constitution.

Deliberations on this matter were conducted within an atmosphere charged with the knowledge of the potentially grave and far-reaching consequences of our decision, regardless of the manner in which we responded to the questions certified. We are bound by the parameters set out in the State Constitution, statutes, and common law which direct our decisionmaking process. We are persuaded, and legal authority directs, that the alleged deleterious effect of an activity upon society is not a proper basis upon which the Courts may declare unlawful any such activity. If the results of our conclusions are "inimicable to public welfare, then it would be a matter for legislative action, and not one for the Courts." *Darlington Theatres, supra,* at 789. The judiciary does not play a role in determining whether video poker machines should be allowed or prohibited in our State. For this reason we must not abuse the language of our constitution to force a solution to an issue that rightfully must be resolved by our General Assembly.

**CERTIFIED QUESTIONS ANSWERED.**

MOORE, J., and CHARLES W. WHETSTONE, Jr., Acting Associate Justice, concur.

BURNETT, J., dissenting in separate opinion.

TOAL, J., concurring and dissenting in separate opinion.

BURNETT, Justice (dissenting):

In my opinion, the Type II and Type III video gaming machines described in the district court's certification order constitute lotteries within the meaning of the South Carolina Constitution. Accordingly, I respectfully dissent. In offering my dissent, I recognize "[t]his Court must construe the constitution and laws of this State without concern for political or

popular opinion." *Martin v. Condon,* 324 S.C. 183, 189, 478 S.E.2d 272, 275 (1996).

## *QUESTIONS OF LAW*

Pursuant to Rule 228, SCACR, the South Carolina Supreme Court agreed to answer the following two questions of law for the United States District Court:

I. What are the factors to be considered and standards to be applied in determining whether a particular type activity is a lottery as prohibited by the South Carolina Constitution?

II. Do the Type II and Type III machines described [in the certification order] constitute lotteries in violation of the South Carolina Constitution?

## *DISCUSSION*

### *I.*

#### A. *Definition of Lottery*

Obtaining its definition from the Random House Dictionary, the majority holds a lottery is "a gambling game . . . in which a large number of tickets are sold and a drawing is held for certain prizes." [1] This definition equates a lottery with a raffle and ignores the South Carolina Constitution and this Court's long-standing legal precedent.

With the adoption of the State Constitution in 1868, lotteries were constitutionally prohibited for the first time in South Carolina. S.C. Const. art. XIV, § 2 (1868) ("Lotteries, and the sale of lottery tickets, for any purpose whatever, are prohibited, and the General Assembly shall prevent the same by penal laws."). Similarly, the 1895 Constitution prohibited lotteries. S.C. Const. art. XVII, § 7 ("No lottery shall ever be allowed, or be advertised by newspaper or otherwise, or its tickets sold in this state; and the General Assembly shall provide by law at its next session for the enforcement of this provision.").

---

1. Random House Dictionary of the English Language 1137 (2nd ed. 1987).

In 1974, the citizens of South Carolina voted to amend the anti-lottery provision of the Constitution. This amendment was ratified by the General Assembly in 1975. The current anti-lottery provision of the South Carolina Constitution states as follows:

> No lottery shall ever be allowed or be advertised by news-papers, or otherwise, or its tickets be sold in this State. The game of bingo, when conducted by charitable, religious or fraternal organizations exempt from federal income taxation or when conducted at recognized State and county fairs, shall not be deemed a lottery prohibited by this section.

S.C. Const. art. XVII, § 7 (emphasis added).

The underscored language of this provision, which has remained virtually unchanged since 1868, is unambiguous. It prohibits *all* lotteries. If the framers of the Constitution had intended to only prohibit ticket lotteries, as asserted by the majority, the constitutional prohibition would have expressly limited the prohibition to ticket lotteries. To the contrary, the South Carolina Constitution has never limited a lottery to a scheme which issues tickets or "other indicium of entitlement to a prize," as asserted by the majority today.

In fact, with the passage of the constitutional amendment in 1974, the citizens of this State specifically recognized that the game of bingo is a lottery prohibited by article XVII, § 7.[2] By adopting the amendment, the citizens of South Carolina legalized the playing of bingo in certain limited instances. Under the majority's definition, however, the playing of bingo would be legal in all circumstances since the game does not involve the issuance of tickets. *See Knight v. State ex rel. Moore,* 574 So.2d 662, 669 (Miss.1990) ("[A]ny attempt to equate a bingo card with a lottery ticket would be superficial at best and unpersuasive at worst."). The majority's definition is contrary to the citizens' understanding of the constitutional provision.

---

2. *Army Navy Bingo, Garrison No. 2196 v. Plowden,* 281 S.C. 226, 314 S.E.2d 339 (1984) (bingo is a lottery); *Bingo Bank, Inc. v. Strom,* 268 S.C. 498, 501, 234 S.E.2d 881, 883 (1977) (" '[T]he game of bingo' under the 1975 amendment refers to the game previously played illegally by charitable organizations throughout the State.").

Further, the constitutional prohibition against the sale of lottery tickets does not limit and/or characterize lotteries as a form of gambling in which tickets are sold. Instead, it merely forbids the sale of lottery tickets, in addition to the operation of lotteries and the advertisement of lotteries. Similarly, in many jurisdictions, the term "lottery" is not limited to "ticket lotteries," even though the constitutions in those jurisdictions, like the Constitution in this State, refer to tickets. Ill. Const. art. IV, § 27 ("[T]he general assembly shall have no power to authorize lotteries or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this state."); Kan. Const. art. XV, § 3 ("Lotteries and the sale of lottery tickets are forever prohibited."); La. Const., art. XIX, § 8 ("Lotteries and the sale of lottery tickets are prohibited in this State."); Ohio Const. art. XV, § 6 ("Lotteries, and the sale of lottery tickets, for any purpose whatever, shall forever be prohibited in this State, except that the General Assembly may authorize an agency of the state to conduct lotteries. . . ."); Oregon Const. art. XV, § 17 ("Lotteries, and the sale of lottery tickets, for any purpose whatever, are prohibited, and the legislative assembly shall prevent the same by penal laws."); Tenn. Const. art. XI, § 5 ("The Legislature shall have no power to authorize lotteries for any purpose and shall pass laws to prevent the sale of lottery tickets in this State."); W.Va. Const. art. VI, § 36 ("The legislature shall have no power to authorize lotteries or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this State; . . . .").

Finally, the majority's definition of "lottery" ignores this Court's holding in *Darlington Theatres v. Coker*, 190 S.C. 282, 2 S.E.2d 782 (1939), where, after considering various definitions,[3] the Court ultimately concluded:

> to constitute a lottery or a scheme in the nature of a lottery, it is essential that three elements be present, to wit: (1) The giving of a prize, (2) by a method involving chance, (3) for a consideration paid by the contestant or participant.

---

3. The majority asserts the issue before the Court in *Darlington Theatres* was not the definition of lottery but whether the element of consideration existed in a particular scheme. To the contrary, the definition of lottery was the precise issue before the Court.

*Id.,* 190 S.C. at 291, 2 S.E.2d at 786. The majority of other jurisdictions have adopted the same three element test in defining the term "lottery" in their own constitutional provisions prohibiting lotteries.[4]

---

4. *See Opinion of the Justices,* 692 So.2d 107, 110 (Ala.1997) ("A 'lottery,' as we have defined that term, contains the following three elements: (1) [a] prize, (2) awarded by chance, (3) for a consideration." (internal citations omitted)); *see also Youngblood v. Bailey,* 459 So.2d 855 (Ala.1984) (recognizing three element test in interpreting constitutional lottery provision); *In re Interrogatories of Governor Regarding Sweepstakes Races Act,* 196 Colo. 353, 585 P.2d 595, 598 (Colo.1978) (en banc) (in interpreting constitutional provision, Court declared, "Our cases have established that a lottery is present when consideration is paid for the opportunity to win a prize awarded by chance."); *National Football League v. Governor of State of Delaware,* 435 F.Supp. 1372, 1383 (D.Del.1977) (in interpreting constitutional provision, Court stated, "It is unquestioned that there are three elements necessary to a lottery: prize, consideration, and chance."); *see also Affiliated Enterprises v. Waller,* 5 A.2d 257, 259 (Del.Super.1939); *Iris Amusement Corp. v. Kelly,* 366 Ill. 256, 8 N.E.2d 648, 651 (Ill.1937) (interpreting constitutional and statutory provisions, the court found "a lottery consists of three essential parts or elements—i.e. (1) a chance, (2) for a prize, (3) for a price."); *State ex rel. Stephan v. Finney,* 254 Kan. 632, 867 P.2d 1034, 1043 (Kan.1994) ("Clearly, the term lottery, as used in art. 15, § 3 of the Kansas Constitution, has been defined by this court as any game, scheme, gift, enterprise, or similar contrivance wherein persons agree to give valuable consideration for the chance to win a prize or prizes."); *Otto v. Kosofsky,* 476 S.W.2d 626, 629 (Ky.1971), *cert. denied,* 409 U.S. 912, 93 S.Ct. 227, 34 L.Ed.2d 173 (1972) (in interpreting constitutional provision, court found "[a] lottery is a scheme for the distribution of prizes or things of value purely by lot or chance among persons who have paid or agreed to pay a consideration for the chance to share in the distribution."); *Gandolfo v. Louisiana State Racing Com'n,* 227 La. 45, 78 So.2d 504, 509 (La.1954) (in interpreting constitutional provision, court stated, "Lottery has been defined as a scheme for the distribution of prizes by lot or chance."); *State ex rel. Home Planners Depository v. Hughes,* 299 Mo. 529, 253 S.W. 229, 230 (Mo.1923) (en banc) (In determining whether a certain scheme was a lottery "within the meaning of section 10 of article 14 of the Constitution, which forbids the authorization of lotteries or gift enterprises for any purpose," the court stated " 'lottery' ... includes every device whereby anything of value is, for a consideration, allotted by chance. . . . Consideration, chance, prize—these are the elements."); *State ex rel. Gabalac v. New Universal Congregation of Living Souls,* 55 Ohio App.2d 96, 379 N.E.2d 242, 244 (Ohio Ct.App.1977) (In interpreting constitutional provision, court rejected the argument that "lottery" includes all gambling, but nevertheless declared, "A lottery is a scheme whereby a monetary consideration is paid and the winner of the prize is determined by lot or chance."); *Hendrix v. McKee,* 281 Or. 123, 575 P.2d 134, 139 (Or.1978) (en banc) (in interpreting constitu-

I do agree with the majority's assertion that a lottery is a form of gambling. However, it does not necessarily follow that "lottery" must be defined narrowly as a scheme in which a large number of tickets are sold and a drawing is held for a certain prize.[5] In fact, this definition leaves unanswered questions. How many tickets must be sold for a scheme to constitute a lottery? If one person buys one thousand tickets

---

tional provision, Court reaffirmed the definition of a lottery as "any scheme whereby one, on paying money or other valuable thing to another, becomes entitled to receive from him such a return in value, or nothing, as some formula of chance may determine. . . ." (quoting *State v. Schwemler*, 154 Or. 533, 60 P.2d 938 (1936))); *see also State v. Coats*, 158 Or. 122, 74 P.2d 1102, 1106 (Or.1938) ("Three things are necessary to constitute a lottery, viz., prize, chance, and consideration."); *Roberts v. Communications Inv. Club of Woonsocket*, 431 A.2d 1206, 1211 (R.I.1981) ("It is well settled that a 'lottery' proscribed in either a state constitution or statute is defined as a scheme or a plan having three essential elements: consideration, chance, and prize."); *Secretary of State v. St. Augustine Church/St. Augustine School*, 766 S.W.2d 499, 501 (Tenn.1989) (in affirming recognition of the three element test by quoting Tennessee precedent—that "[b]y the great weight of authority, in order that a transaction may be a lottery, three elements must be present consideration, prize and chance"—court held that bingo clearly constituted a lottery under the Tennessee Constitution); *Albertson's Inc. v. Hansen*, 600 P.2d 982, 985 (Utah 1979) (In interpreting constitutional and statutory provisions restricting lotteries, Court declared, "to be a lottery, this scheme must involve 'property' (or 'prize'), a distribution by 'chance,' and the payment of 'any valuable consideration for the chance.' "); *State ex rel. Evans v. Brotherhood of Friends*, 41 Wash.2d 133, 247 P.2d 787, 796 (Wash.1952) (en banc) (in interpreting constitutional provision, the court declared, "The overwhelming weight of authority is to the effect that slot machines as here involved and of the usual type and variety are lotteries."); *State v. Hudson*, 128 W.Va. 655, 37 S.E.2d 553, 558 (W.Va.1946) ("The essential elements of a lottery are consideration, prize and chance, and, where they are present and chance predominates, even though skill or judgment may enter to some extent in the operation of a particular scheme or device, the scheme or device is a lottery."); *Coca–Cola Bottling Co. of Wisconsin v. La Follette*, 106 Wis.2d 162, 316 N.W.2d 129, 132 (Wis.Ct.App.1982) (In considering the state's constitutional and statutory provisions restricting lotteries, the Court stated, "At common law, there are three elements of a lottery—a prize, chance, and a consideration.").

5. The majority relies on *Rountree v. Ingle*, 94 S.C. 231, 77 S.E. 931 (1913), and *State v. Pinchback*, 9 S.C.L. (2 Mill) 128 (1818), as holding the definition of "lottery" must be narrowly construed. *Rountree* did not discuss the definition of lottery. *Pinchback* involved the application of a penal statute and the decision was issued before any constitutional provision prohibiting lotteries.

and another buys one ticket, is the game a lottery? If the prize is altered by the number of players, i.e., the prize is determined by the number of participants, is the prize "certain?" [6]

I adhere to the three element test established in *Darlington Theatres, supra,* to define the term "lottery." While the framers of the South Carolina Constitution could not contemplate computer simulated games when drafting the anti-lottery provision of the Constitution, they nonetheless intended to prohibit lotteries, i.e., all schemes involving consideration, chance, and prize. The Constitution is a flexible document applicable to changing times and conditions. *Knight v. Hollings,* 242 S.C. 1, 4, 129 S.E.2d 746, 747 (1963) ("[A] constitutional provision ... is not to be viewed solely in the light of conditions existing at the time of its adoption, being intended not to obstruct the progress of the state but rather to meet and be applied to new conditions and circumstances as they may arise...."). Accordingly, any scheme which meets the definition of lottery is prohibited by the Constitution. *See* 38 Am.Jur.2d, *Gambling* § 5 (1968) ("It has been said that the word 'lottery' is generic, and that it includes every device whereby anything of value is, for a consideration, allotted by chance.").

## B. *Chance*

Since I adhere to the three element test established in *Darlington Theatres,* it is necessary that I define the role of chance in deciding whether a particular scheme is a lottery.[7]

### 1. *The Parties' Arguments*

In determining the role of chance, the defendants maintain the "British Rule" or "pure chance doctrine" is the established law in South Carolina. Under this doctrine, only a scheme in which the result is determined solely by chance is a lottery; if skill plays any part, the scheme is not a lottery. *Braddock v. Family Finance Corporation,* 95 Idaho 256, 506 P.2d 824

---

6. The majority provides no legal authority, and I have located none, which requires a "certain prize" as an element of a lottery.

7. Because the parties appear to agree on the definitions of consideration and prize, I will not define those terms.

(Idaho 1973) (a scheme is considered a lottery when a participant's judgment plays no part in the selection and award of the prize). Defendants base their argument on *Powell v. Red Carpet Lounge*, 280 S.C. 142, 311 S.E.2d 719 (1984), and the reception statute.[8]

The plaintiffs contend the Court should adopt the "American Rule" or "dominant factor doctrine" in determining whether a game is one of skill or chance. Under the dominant factor doctrine, "a scheme constitutes a lottery where chance dominates the distribution of prizes, even though such a distribution is affected to some degree by the exercise of skill or judgment." *Morrow v. State*, 511 P.2d 127, 129 (Alaska 1973).

### 2. *Analysis*

In my opinion, the British rule or pure chance doctrine is not the established law in South Carolina. *Red Carpet, id.,* is not controlling. In *Red Carpet,* the sheriff seized the defendant's coin-operated machines to determine the legality of their existence and possession. The Court specified there was no allegation of illegal use of the machines. The Court determined the possession of the machines did not violate the constitution and, further, as there was no indication the machines were used for illegal purposes, the lottery issue was not involved. *Red Carpet* did not in any manner describe the role of chance in determining whether a scheme is a lottery.

Moreover, in accordance with the reception statute, the common law of England is ordinarily presumed to govern if there is no South Carolina authority to the contrary. *State ex rel. McLeod v. Sloan Construction Co., Inc.,* 284 S.C. 491, 328 S.E.2d 84 (Ct.App.1985). This statute does not, however, preclude the Court from interpreting the Constitution and declaring the law of South Carolina. This is the first occasion in which the Court has considered the role of chance within the meaning of the term "lottery."

---

**8.** S.C.Code Ann. § 14–1–50 (1977) ("All, and every part, of the common law of England, where it is not altered by the Code or inconsistent with the Constitution or law of this State, is hereby continued in full force and effect in the same manner as before the adoption of this section.").

I reject the pure chance doctrine. Under the doctrine, any skill, however minimal, is sufficient to remove a scheme from the definition of lottery. Under the pure chance doctrine many obviously chance-based games, such as guessing contests, would not be lotteries. For instance, a mathematician might more accurately predict the number of marbles in a glass bowl than a non-mathematician. However, certain unknown elements, such as the thickness of the glass and number of marbles hidden from view, would make an exact calculation impossible. Under the pure chance doctrine, some skill would be exercised in determining the number of marbles and the contest would not be a lottery. *See State ex Inf. McKittrick v. Globe–Democrat Pub. Co.,* 341 Mo. 862, 110 S.W.2d 705 (Mo.1937) (en banc).

Instead, I would hold, where the dominant factor in a participant's success or failure in a particular scheme is beyond his control, the scheme is a lottery, even though the participant exercises some degree of skill or judgment. If a participant's skill does not govern the result of the game, the scheme contains the requisite chance necessary to constitute a lottery. On the other hand, if through the exercise of skill or judgment a participant can determine the outcome, the scheme is not a lottery.[9] My opinion is supported by the majority of jurisdictions which have considered this question.[10]

---

**9.** I note the language in *Darlington Theatres, supra,* "by a method involving chance," suggests even the minimal involvement of chance in a scheme is sufficient to constitute a lottery.

**10.** *United States v. Marder,* 48 F.3d 564, 569 (1st Cir.), *cert. denied,* 514 U.S. 1056, 115 S.Ct. 1441, 131 L.Ed.2d 320 (1995) (Under Massachusetts law, "[C]hance must predominate over skill in the results of the game, or the element of chance must be present in such a manner as to thwart the exercise of skill or judgment in a game."); *Johnson v. Phinney,* 218 F.2d 303, 306 (5th Cir.1955) ("With respect to the element of chance, the authorities are in general agreement that if such element is present and predominates in the determination of a winner, the fact that players may exercise varying degrees of skill is immaterial; and the game or device is a lottery."); *National Football League v. Governor, supra* at 1385 ("I conclude that the legislative interpretation of the term lottery together with the weight of authority in other jurisdictions would persuade the Delaware Supreme Court that 'lottery' should be interpreted to encompass not only games of pure chance but also games in which chance is the dominant determining factor."); *Morrow v. State, supra* at 129 ("We agree that the sounder approach is to determine the

character of the scheme under the dominant factor rule."); *State ex Inf. McKittrick v. Globe–Democrat Pub. Co., supra,* at 713 ("[A] contest may be a lottery even though skill, judgment, or research enter thereinto in some degree, if chance in a larger degree determine[s] the result."); *People v. Settles,* 29 Cal.App.2d Supp. 781, 78 P.2d 274, 277 (Cal.App. Dep't Super. Co.1938) ("The test of the character of a game or scheme as one of chance or skill is which of these factors is dominant in determining the result."); *Finster v. Keller,* 18 Cal.App.3d 836, 96 Cal.Rptr. 241 (Cal.Ct.App.1971); *In re Interrogatories, supra* at 598 ("Article XVIII, Section 2 [of the Colorado Constitution] is violated if chance is the controlling factor in the award."); *Tinder v. Music Operating, Inc.,* 237 Ind. 33, 142 N.E.2d 610, 614 (Ind.1957) ("In a lottery the winning of a prize is dependent primarily, if not solely, upon chance. In none of said cases was the prize dependent upon the skill or manipulation of the player. This is a significant factor not contemplated in a lottery."); *Commonwealth v. Lake,* 317 Mass. 264, 57 N.E.2d 923, 925 (Mass.1944.) ("[A] game is now considered a lottery if the element of chance predominates and not a lottery if the element of skill predominates."); *State v. Hahn,* 105 Mont. 270, 72 P.2d 459, 461 (Mont.1937), *overruled on other grds. State v. Bosch,* 125 Mont. 566, 242 P.2d 477 (Mont.1952) ("The test of the character of the game is not whether it contains an element of chance or an element of skill, but which is the dominating element that determines the result of the game."); *State v. Steever,* 103 N.J.Super. 149, 246 A.2d 743 (N.J.Super.Ct.App.Div.1968) (football pool was lottery because it involved substantial element of chance); *Hoff v. Daily Graphic, Inc.,* 132 Misc. 597, 230 N.Y.S. 360, 363 (N.Y.Sup.Ct.1928) ("The test of the character of the game is not whether it contains an element of chance or an element of skill, but which is the dominating element that determines the result of the game."); *State v. Stroupe,* 238 N.C. 34, 76 S.E.2d 313, 317 (N.C.1953) ("[T]he test of the character of [the game] ... is not whether it contains an element of chance or an element of skill, but which of these is the dominating element that determines the result of the game...."); *Stevens v. Cincinnati Times–Star Co.,* 72 Ohio St. 112, 73 N.E. 1058, 1061 (Ohio 1905) ("[I]f the dominating, determining element is one of chance, that element gives character to the whole scheme."); *Commonwealth v. Laniewski,* 173 Pa.Super. 245, 98 A.2d 215, 217 (Pa.Super.Ct.1953) ("It is sufficient that chance be the dominant factor."); *Roberts v. Communications Investment Club of Woonsocket, supra* at 1211 ("In deciding whether the element of chance is present, we adopt, as have most jurisdictions which have faced this issue, the 'dominant factor' doctrine, under which a scheme constitutes a lottery when an element of chance dominates the distribution of prizes, even though such a distribution is affected to some degree by the exercise of skill or judgment."); *D'Orio v. Startup Candy Co.,* 71 Utah 410, 266 P. 1037, 1038 (Utah 1928) (chance must be dominating element); *Seattle Times Co. v. Tielsch,* 80 Wash.2d 502, 495 P.2d 1366 (Wash.1972) (en banc) (dominant factor test); *State v. Hudson, supra* at 558 ("[A] lottery exists, even though skill, judgment or research enters to some extent, if chance predominates in the determination of the result."); *see also State v. Wassick,* 156 W.Va. 128, 191 S.E.2d 283 (W.Va.1972); *State v. Dahlk,* 111 Wis.2d 287, 330 N.W.2d 611, 617

Only three jurisdictions adopt the pure chance doctrine.[11]

## II.

Applying the elements of consideration, prize, and chance to the video gaming machines described in the district court's certification order, I reach the following conclusions:

### A. *Consideration*

According to the certification order, play on all of the video gaming machines "requires the payment of money directly into the machines." Order, p. 6. The payment of money in order to play a video game is consideration.

### B. *Prize*

With regard to all of the video gaming machines, the certification order finds "[t]he player can receive cash at the conclusion of play for any accumulated credits, ...." Order, p. 6. A cash award is clearly a prize.

### C. *Chance*

The certification order describes the Type II and Type III video game devices, in part, as follows:

> The machines at issue are microprocessor based devices with random number generators....
>
> Specific operation of the games on the machines varies significantly. *In each case, however, significant facets of the game are controlled by the selection of a card, number, or icon by the random number generator ... In each case, ..., the random selection is critical to the play of the game because it determines the numbers, cards, or icons which,*

---

(Wis.Ct.App.1983) ("Chance rather than skill must therefore be the dominant factor controlling the award in a lottery. Most jurisdictions apply the 'dominant factor' test, by which a scheme is a lottery if chance dominates even though some degree of skill or judgment is present.").

11. *See Opinion of the Justices, supra* (as long as there is some degree of skill, that activity differs from a lottery); *Braddock v. Family Finance Corp., supra* (any skill or judgment practiced by the participant removes the enterprise from the category of lottery); *State v. Coats, supra* (if any substantial degree of skill or judgment is involved, it is not a lottery).

*in turn, determine whether the player wins or loses the game. The random selections occur independent of the control or direction of the player, regardless of the player's skill, knowledge, or experience.*

In most instances, all decisions made by the player that might affect the outcome of the game are made before the last random selection. In the remaining instances, the last act may be the player's decision not to risk an already strong hand by subjecting it to an additional random act.

In the process of designing the games, the manufacturers use mathematical models to determine the 'optimum play.' Optimum play models establish the rate of financial return a player using the best possible strategy for maximizing winning potential can expect to receive ... *The pay tables are adjusted by the manufacturers so that, over time, even optimum play would result in a return of less than 100%. In other words the machines are designed to return, on average, less than one dollar for each dollar spent, even with players using the best possible strategies ....*

Order, pp. 6–8 (emphasis added).

The order specifically describes the Type II games as follows:

The second category of games ("Type II") include the games of lotto, bingo, and the traditional game of keno. The player deposits his or her money, the player makes some decision, a random selection occurs, and the outcome of the game is determined. Although the player makes some decision in the process of playing these games, such as by selecting an arbitrary number, *the player's decision does not affect the role that chance plays in the outcome of the game.*

Order, p. 9 (emphasis added).

As noted in the certification order, one of the defendants' expert mathematicians testified Type II games operate purely on chance. The district judge stated, "[i]t is, therefore, without dispute that Type II games are pure games of chance." Order, p. 12.

Under either the pure chance doctrine or dominant factor doctrine, chance governs the outcome of a Type II video game. I would hold Type II games constitute lotteries in violation of Article XVII, § 7 of the South Carolina Constitution.

With regard to Type III games, the certification order finds:

The third category of games ("Type III") includes games such as poker and black jack as well as one variety of keno. In these games, the player makes a variety of decisions at one or more points during play of the game. The decisions the player makes may affect the continued play and the ultimate results of the game in a variety of ways.

First, the player may make decisions as to how to continue to play. For instance, in a poker game the player will decide which cards to keep and which to discard. While this decision could be based on sheer caprice, it would normally be based on the player's view of the probability of receiving certain replacement cards that would constitute a winning hand. This decision may also be influenced by the player's analysis of the relative value of the given hands that could be received. In other words, a player faced with two or more possible "good" options may be willing to try for the less likely hand if the payout is high enough to justify the increased risk ...

In short, the Type III games are the most complex and diverse.... Still, some features are common to all machines.... In particular, each game begins with the random selection of cards, numbers, or other icons. The player sees these and is given an opportunity to make one or more decisions. A second random selection is then made by the machine. *The ultimate outcome is, therefore, influenced by, but is not entirely determined by the player's decisions. However, regardless of skill, knowledge, or experience, a player cannot alter the probabilities inherent in the play of any Type I, Type II, or Type III video machine games. Neither can the player modify the function of the random number generator, or the random delivery of cards, numbers, or icons.*

*Further, in any particular play, the odds of obtaining a particular card or combination of cards after discard are weighted against the player.*

Order, pp. 9–11 (emphasis added).

Whether chance predominates over skill is not easily answered with regard to the Type III games because the parties define "skill" differently. The plaintiffs maintain since play is completed by a random act outside the control of a player or by a player's decision to stand on the result of a prior random act, and the odds are stacked against a player, chance predominates. In effect, the plaintiffs define "skill" as the ability to affect the odds of obtaining a given card and, ultimately, the outcome of the game.

On the other hand, the defendants define "skill" as a player's ability to maximize the numbers of credits or dollars won through knowledge of probabilities and consideration of the potential payoff. One of the defendants' experts presented a mathematical model which compared the results of a player using optimum game strategy with a player acting entirely randomly. Since the most skilled player would win back 96.5% of his credits and the most unskilled player would win back 31% of his credits, the expert concluded skill predominated over chance.

Another of the defendants' experts testified, with regard to video blackjack, differing play strategies could produce differences in excess of 50% in returns expected from the best and worst players. In the modified keno game, "Double Up Keno," there would be even greater differences in the expected returns of the best and worst players. The district court noted "[t]his testimony was based on the same form of mathematical model discussed [by the defendants' previous expert]." Order, p. 19.

As noted in the defendants' expert's mathematical model, the probability of obtaining a particular hand does not increase, regardless of a player's level of skill. Although a skilled player (unlike an unskilled player) can improve his chances of winning and maximize those winnings, his ability to affect the outcome of a game, i.e., actually obtain the winning card, is determined by the random number generator. Similarly, if two players both exercise optimal strategy, chance would determine which player, if either, would obtain a given

card. A player's skill, no matter how good or poor, does not control the random "deal" of the cards.

In my opinion, skill should be defined in terms of the ability to obtain the desired outcome—a certain card—rather than the ability of one player to play more judiciously than another.[12] As noted by the certification order, a video poker player is unable to control the random selection of cards, in spite of his skill, knowledge, or experience. Since the player cannot improve the likelihood he will obtain a certain card, I conclude chance dominates over skill in the operation of the Type III video game machines. My conclusion is supported by authority from numerous other jurisdictions.[13] Accordingly, the Type III video machines are lotteries and, therefore, illegal under Article XVII, § 7 of the South Carolina Constitution.

---

12. *See State ex Inf. McKittrick v. Globe–Democrat Pub. Co., supra* at 717 ("The rule that chance must be the dominant factor is to be taken in a qualitative or causative sense rather than in a quantitative sense.").

13. *United States v. Marder, supra* (evidence supported finding chance predominated over skill in playing video poker); *Games Management, Inc. v. Owens,* 233 Kan. 444, 662 P.2d 260, 264 (Kan.1983) ("[t]he small amount of skill required to play [video games of 'Double–Up' (poker) and 'Twenty–One' (version of blackjack)] is clearly overshadowed by pure chance" where the winner is determined by random appearance of cards over which the player has no control); *Garono v. State,* 37 Ohio St.3d 171, 524 N.E.2d 496, 500 (Ohio 1988) (In finding video poker machines are games of chance, "[t]he fact that an element of skill may be involved in a game does not override the fact that elements of chance exist and, therefore, the game can be classified as a game of chance."); *Commonwealth v. Two Electronic Poker Game Machines,* 502 Pa. 186, 465 A.2d 973, 978 (Pa.1983) (In playing video poker machine, "the element of chance predominates and the outcome is largely determined by chance."); *United States v. Dobkin,* 188 W.Va. 209, 423 S.E.2d 612, 614 (W.Va.1992) ("[A]lthough there is some element of skill involved, poker or any electronic simulation thereof, is a game of chance."); *Score Family Fun Center, Inc. v. County of San Diego,* 225 Cal.App.3d 1217, 275 Cal.Rptr. 358 (Cal.App. 4 Dist.1990) ("Mini–Boy 7" video game which offers games of draw poker, seven card stud, blackjack, baccarat, hi-lo, double-up, and craps, is game of chance); *Plato's Cave Corporation v. State Liquor Authority,* 115 A.D.2d 426, 496 N.Y.S.2d 436, 438 (N.Y.A.D. 1 Dept.1985) ("Although there is a degree of skill in playing poker, 'the outcome depends in a material degree upon an element of chance,' i.e. the draw of the cards." (internal cites omitted)); *Collins Coin Music of North Carolina v. North Carolina Alcoholic Beverage Control Comn.,* 117 N.C.App. 405, 451 S.E.2d 306, 308 (N.C.App.1994) ("[A]lthough a player's knowledge of statistical probabilities can maximize his winnings in the short term, he cannot determine or influence the result since the cards are drawn at random.").

### *CONCLUSION*

The majority suggests it is the General Assembly's role to determine whether video gambling is inimical to the public welfare and, if so, respond with appropriate legislation. I agree. Nonetheless, this Court is ultimately responsible for interpreting the South Carolina Constitution. *Evatte v. Cass,* 217 S.C. 62, 65, 59 S.E.2d 638, 639 (1950) ("[T]he final responsibility of interpreting the Constitution rests upon this Court."). I construe Article XVII, § 7 of the South Carolina Constitution as prohibiting all schemes which meet the definition of "lottery," including the video gaming machines described in the federal district court's certification order.

TOAL, Justice (concurring and dissenting):

Because I profoundly disagree with the analysis and conclusions reached by the majority, I must join my brother Justice Burnett's opinion in substance. I concur in Justice Burnett's answer to the first certified question. He has set forth the legal standard which should be used to define the term lottery as it appears in South Carolina's Constitution in a manner which is faithful to our Court's precedents and well within the mainstream of American court decisions. I also concur with Justice Burnett's answer to the second certified question in which he applies his definition of lottery to the machines in question and concludes that Type II and Type III video gaming machines do constitute lotteries under our constitution.

However, I write separately to express the view that the United States District Court for the District of South Carolina is free to answer the second question as Justice Burnett and I do. In order to explain this view, I concur only in that portion of the majority's opinion which concludes that since the second certified question asks us to decide a factual question, no such finding will be binding on the federal district court for purposes of entry of any permanent injunction or award of damages. Since our opinions regarding the application of any of the proposed tests are advisory, it is within the federal district court's prerogative to decide whether Type II and Type III machines are unconstitutional. My own advice to the federal court is that under any of the definitions of lottery put

forth by this Court today, Type II and Type III machines are clearly unconstitutional in South Carolina. Each of these points is discussed below.

## A. ADVISORY NATURE OF OPINIONS

The federal district court asked this Court to answer two certified questions. The first question asked us to provide South Carolina's legal definition of a lottery. The second question asked us to apply that definition to the *preliminary* findings of fact in this case, *i.e.*, to decide a factual question. In answering the second certified question, the majority advises the federal district court that under their definition of lottery, the video poker machines at issue here do not constitute lotteries under the South Carolina Constitution. Justice Burnett and I disagree with them.

As noted by Chief Justice Finney and stated in the Order of Certification, "no finding of this Court will be binding for entry of any permanent injunction or for the award of damages by the District Court." This Court may accept certified questions only to answer questions of law. Rule 228(a), SCACR. Thus, this Court's determination of whether Type II and Type III are in fact "lotteries" under our Constitution does not bind the federal district court. This determination is ultimately in the hands of the federal district court.

## B. APPLICATION OF THE MAJORITY TEST

Under Justice Burnett's test, in which I join, Type II and Type III machines are clearly unconstitutional. The majority, on the other hand, advises that under its test, Type II and Type III machines are not unconstitutional lotteries. However, I believe that even under the test proposed by the majority, the federal district court can conclude that Type II and Type III machines constitute a lottery under our Constitution.

The majority concludes that the video gaming machines are not unconstitutional lotteries because they do not involve (1) a drawing and (2) "tickets" or other indicium of entitlement to a prize.

Although the majority finds that the video gaming machines do not involve a "drawing," the majority fails to consider that the machines at issue here function in the same manner as

most modern popular lotteries. These popular lotteries involve a random generation of numbers to determine the winning combination. The "drawing" does not depend upon the number of people playing the lottery. As such, single person play would not negate the fact that a drawing takes place. Similarly, in this case, all of the video gaming machines are microprocessor based devices with random number generators. A player wins if the right combination of numbers is generated by the machine. Thus, a drawing occurs by the machines' random generation of numbers, irrespective of the number of people playing.

As for the second requirement of "tickets," even the majority recognizes that the definition of "tickets" should take into account modern technology. The majority states in footnote 10 of its opinion that "[e]lectronic ticketing would not necessarily preclude finding a lottery where electronic registration is the functional equivalent of a lottery ticket...." In the instant case, although a player does not receive an actual ticket or token prior to playing the game, his opportunity to win is symbolized by the activation of the machine upon the insertion of money and the compilation of his credits or plays displayed during the game. Upon the insertion of money, the machines reveal the player's monetary credit with that game. The machines keep track of the player's initial credit and any "free plays" the player wins during his game. These credits are what the player exchanges with the store owner for cash. There is no practical difference between a physical ticket evidencing the right to play for a prize and an electronic representation of such a right in the form of free play credits. Furthermore, the right to receive the cash prizes from the machine owners is physically represented by the ticket the player receives when he cashes out a game. That prize amount is limited by statute.

Finally, although the majority opinion does not discuss the requirement of chance, it is patently clear Type II and Type III video machines would satisfy even a pure chance standard. As stated in the Order of Certification, all of the machines are microprocessor based devices with random number generators. The random selections occur independent of the control or direction of the player, regardless of the player's skill, knowledge, or experience. (Ord. p. 6–7). The bottom line is

that a player cannot alter the probabilities inherent in the play of Type I, Type II, or Type III video machine games. (Ord. p. 10).

Thus, in my view, under any of the tests proposed today, Type II and Type III video game machines are illegal lotteries under the South Carolina Constitution. Of course, the final application of the law to the facts of this case rests wholly within the discretion of the federal district court. It may very well be that the federal district court, having asked our advice on the application of our lottery test to the facts before it, will accept the advice of the majority. I simply express the view that these opinions give the federal district court a range of choices.

## C. Conclusion

Although no solid consensus has been reached in this case, the members of this Court have attempted with mutual respect and in utter good faith to reconcile our positions on the South Carolina Constitution's anti-lottery provision and its application to video gaming machines. As part of the judicial branch of government, our role is limited to discerning the meaning and application of existing law. Naturally, interpretations may vary among members of any court. My profound disagreement with my brothers in the majority is matched by my enduring respect for their sincerity and integrity. Although many appellate courts transform passionate philosophical disagreement into permanent rupture of the court's collegiality,[1] this Court will not splinter over any given opinion.[2] We have each considered and circulated many drafts of these opinions. I offer this glimpse into the deliberations of conference in order to underscore the complexity of this matter and

---

1. See E. Lazarus, *Closed Chambers: The First Eyewitness Account of the Epic Struggles Inside the Supreme Court*, Times Books, Random House, 1998. In an act of consummate disloyalty to the court he once served, the author, a former law clerk, describes bitter division with our highest court.

2. Eminent contemporary southern historian Dr. Walter Edgar proposes as his working thesis for *South Carolina: A History*, University of South Carolina Press, 1998, that the hallmark of South Carolinians is our impulse to conduct ourselves so as to achieve "the good order and harmony of the whole community."

gravity of our consideration. We are greatly divided on this case, but one truth about our Constitution in which we are all united is that we have no role to play in answering the broader policy questions of whether video gaming machines and other lotteries should be allowed, prohibited, or regulated in South Carolina. These policy decisions can only be made by the statutory enactment of the General Assembly, regulatory action of the executive agencies so empowered, or by further Constitutional mandate of the people of South Carolina.